## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

DALTON HASTEY, derivatively on behalf of YRC WORLDWIDE INC.,

      Plaintiff,

      v.

JAMES L. WELCH, JAMIE G. PIERSON, STEPHANIE D. FISHER, RAYMOND J. BROMARK, DOUGLAS A. CARTY, WILLIAM R. DAVIDSON, MATTHEW A. DOHENY, ROBERT L. FRIEDMAN, JAMES E. HOFFMAN, MICHAEL J. KNEELAND, PATRICIA M. NAZEMETZ, and JAMES F. WINESTOCK,

      Defendants,

      and

YRC WORLDWIDE INC.,

      Nominal Defendant.

Case No.: 2:19-cv-2266

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Dalton Hastey ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant YRC Worldwide Inc. ("YRC" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants James L. Welch, Jamie G. Pierson, Stephanie D. Fisher, Raymond J. Bromark, Douglas A. Carty, William R. Davidson, Matthew A. Doheny, Robert L. Friedman, James E. Hoffman, Michael J. Kneeland, Patricia M. Nazemetz, and James F. Winestock (collectively, the "Individual Defendants," and together with YRC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of YRC, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding YRC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by YRC's directors and/or officers.

2.      YRC is a holding company that, through its operating subsidiaries, offers its customers a wide range of transportation services.  The Company also offers expertise in heavyweight shipments and flexible supply chain solutions to help its customers ship industrial, commercial, and retail goods.

3.      The Company's reporting segments include: (1) YRC Freight, which focuses on longer haul business opportunities with national, regional, and international services, and (2) Regional Transportation, which is for the Company's transportation service providers focused on business opportunities in the regional and next-day delivery markets.

4.      The Company's YRC Freight reporting segment provides operations results for YRC subsidiary YRC Freight, Inc. ("YRC Freight"), the entity resulting from a 2009 merger

between Yellow Transportation, Inc. ("Yellow Transportation") and Roadway Express, Inc. ("Roadway Express").

5.      On December 14, 2018, the Department of Justice ("DOJ") issued a press release announcing that the United States had initiated an action against YRC Freight, Roadway Express, and Yellow Transportation "alleging that these companies systematically overcharged [the Department of Defense] for freight carrier services and made false statements to the government that hid their misconduct" captioned *United States ex rel. Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc*., Civil Action No. 08-cv-0811 (W.D.N.Y.) (the "DOD Action").

6.      On this news, the price per share of YRC stock fell $1.26, or approximately 28.4%, from the previous day's closing price, closing at $3.17 on December 14, 2018.

7.      From at least September 2005 to October 2013, YRC Freight, Yellow Transportation, and Roadway Express violated the False Claims Act by overcharging the United States Department of Defense (the "DOD") for freight carrier services by failing to comply with the contractual terms of freight contracts between the DOD and the Company and related government procurement rules, including by systematically overcharging the government. The misconduct also included causing the Company's customers, including the DOD, to overpay for shipments that were lighter, and therefore cheaper, than the weights they were charged for (collectively, the "Reweighing Misconduct").

8.      The Individual Defendants additionally breached their fiduciary duties by causing the Company to fail to maintain internal controls.

9.      Also from at least March 10, 2014 through December 14, 2018, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to

make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.    In light of the Individual Defendants' misconduct, which has subjected YRC, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of New York (the "Securities Class Action"),  the DOD Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's

liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of YRC's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

14.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

19.     Venue is proper in this District because YRC and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of YRC common stock. Plaintiff has continuously held YRC common stock at all relevant times.

### Nominal Defendant YRC

21.     YRC is a Delaware corporation with its principal executive offices at 10990 Roe Avenue, Overland Park, Kansas 66211. YRC's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "YRCW."

### Defendant Welch

22.     Defendant James L. Welch ("Welch") served as the Company's CEO from July 2011 to April 2018 and as a Company director from July 2011 to July 2018.  According to the Company's Schedule 14A filed with the SEC on March 19, 2018 (the "2018 Proxy Statement"), as of March 5, 2018, Defendant Welch beneficially owned 492,938 shares of the Company's common stock, which represented 1.5% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Welch owned approximately $4.37 million worth of YRC stock.

23.     For the fiscal year ended December 31, 2018, Defendant Welch received $4,331,248 in compensation from the Company. This included $525,000 in salary, $1,485,829 in stock awards, $2,237,813 in non-equity incentive plan compensation, and $82,606 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Welch received

$2,191,739 in compensation from the Company. This included $891,667 in salary, $1,244,971 in stock awards, $29,000 for change in pension value, and $26,101 in all other compensation.

24.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Welch made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/10/2017 | 50,000 | $12.16 | $608,000 |
| 11/13/2017 | 50,000 | $12.32 | $616,000 |
| 2/17/2017 | 100,000 | $13.14 | $1,314,000 |
| 8/31/2016 | 19,918 | $11.61 | $231,247 |
| 8/5/2016 | 42,346 | $12.32 | $521,702 |
| 8/6/2015 | 41,107 | $20.08 | $825,469 |
| 8/4/2015 | 40,000 | $20.13 | $805,280 |
| 11/28/2014 | 1,700 | $24.26 | $41,248 |
| 12/1/2014 | 8,300 | $24.01 | $199,249 |
| 11/25/2014 | 10,000 | $23.80 | $238,050 |
| 11/24/2014 | 10,194 | $23.52 | $239,722 |
| 11/14/2014 | 10,000 | $23.75 | $237,500 |

25.     Thus, in total, before the fraud was exposed, he sold 383,565 Company shares on inside information, for which he received almost $5.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

26.     The Company's 2018 Proxy Statement stated the following about Defendant Welch:

> YRC Worldwide Inc.: Chief Executive Officer (since 2011); Dynamex Inc. (transportation and logistics services): President and Chief Executive Officer (2008 – 2011); JHT Holdings (truck transportation): Interim Chief Executive Officer (2007 – 2008); Yellow Transportation Inc. (subsidiary of our Company): President and Chief Executive Officer (2000 – 2007), and various other positions (1978 – 2000); Current Director: SkyWest Inc. (regional airline); Former Director: Dynamex Inc., Spirit AeroSystems Holdings Inc. (commercial airplane assemblies and components), Roadrunner Transportation (transportation and logistics services), Erickson Air Crane, Inc. (heavy lift helicopter company).

Mr. Welch has both front line and senior executive experience in our industry and is a 35-year veteran of our Company. Our Board relies on his knowledge and perspectives about our industry, operations, business and competitive environment, strategies, challenges and opportunities. Mr. Welch's leadership skills have been crucial in developing and leading our turnaround strategy, reinvigorating our corporate culture and employee morale, returning our Company to operating profitability, and building an effective leadership team.

**Defendant Pierson**

27.     Defendant Jamie G. Pierson ("Pierson") served as the Company's CFO from November 2011 to December 2016.  Pierson served as a consultant for six months subsequent to his resignation.  According to the Company's Schedule 14A filed with the SEC on March 17, 2016 (the "2016 Proxy Statement"), as of March 3, 2016, Defendant Pierson beneficially owned 207,679 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 2, 2016 was $8.44, Defendant Pierson owned approximately $1.75 million worth of YRC stock.

28.     For the fiscal year ended December 31, 2016, Defendant Pierson received $1,631,797 in compensation from the Company. This included $612,000 in salary, $908,299 in stock awards, and $111,498 in all other compensation.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pierson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/12/2016 | 49,000 | $11.28 | $552,720 |
| 8/4/2015 | 84,155 | $20.40 | $1,716,761 |
| 11/20/2014 | 10,596 | $22.47 | $238,123 |
| 3/11/2014 | 19,700 | $24.35 | $479,655 |

30.     Thus, in total, before the fraud was exposed, he sold 163,451 Company shares on inside information, for which he received almost $3 million. His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Fisher**

31.     Defendant Stephanie D. Fisher ("Fisher") has served as the Company's CFO since May 2017.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Fisher beneficially owned 66,424 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Fisher owned approximately $588,517 worth of YRC stock.

32.     For the fiscal year ended December 31, 2018, Defendant Fisher received $1,500,317 in compensation from the Company. This included $400,000 in salary, $141,214 in stock awards, $930,000 in non-equity incentive plan compensation, and $29,103 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Fisher received $584,902 in compensation from the Company. This included $358,285 in salary, a $43,205 bonus, $138,334 in stock awards, and $45,078 in all other compensation.

33.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Fisher made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/7/2014 | 5,000 | $23.50 | $117,500 |

34.     Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

**Defendant Bromark**

35.     Defendant Raymond J. Bromark ("Bromark") has served as a Company director since July 2011.  He also serves as Chairman of the Audit & Ethics Committee.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Bromark beneficially owned 76,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Bromark owned approximately $679,199 worth of YRC stock.

36.     For the fiscal year ended December 31, 2018, Defendant Bromark received $251,044 in compensation from the Company. This included $130,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Bromark received $232,289 in compensation from the Company. This included $100,000 in fees earned or cash paid and $132,289 in stock awards.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bromark made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 5/22/2018 | 5,000 | $10.79 | $53,949 |
| 5/5/2014 | 5,000 | $21.17 | $105,835 |

38.     Thus, in total, before the fraud was exposed, he sold 10,000 Company shares on inside information, for which he received approximately $159,784. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Bromark:

> Retired (since 2006); PricewaterhouseCoopers LLP (accounting and advisory services): (1967 – 2006), Head of Professional, Technical, Risk and Quality Group

(2000 – 2006), Global Audit Partner (1994 – 2000), Deputy Vice Chairman, Audit and Business Advisory Services (1990 –1994), Audit Partner (1980 – 1990), and consultant (2006 – 2007); Current Director: Frontera Energy Corporation (previously Pacific Exploration & Production Corp.) (explorer and producer of natural gas and crude oil); CA, Inc. (information technology management software and services); Tesoro Logistics GP, LLC, the General Partner of Andeavor Logistics LP (previously Tesoro Logistics LP) (operator, developer and acquirer of crude oil, refined products and natural gas logistics assets).

Mr. Bromark draws on his extensive experience in accounting, auditing, financial reporting and compliance, and regulatory affairs; deep understanding of financial controls and familiarity with large public company audit clients; experience in leadership positions at PricewaterhouseCoopers LLP; and experience as a current or former director, including audit committee chairman, of other public companies to provide important guidance to our Board on financial reporting and accounting issues affecting our Company.

**Defendant Carty**

40.     Defendant Douglas A. Carty ("Carty") has served as a Company director since July 2011.   He also serves as a member of the Audit & Ethics Committee, the Compensation Committee, and the Finance Committee.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Carty beneficially owned 71,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Carty owned approximately $634,899 worth of YRC stock.

41.     For the fiscal year ended December 31, 2018, Defendant Carty received $226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Carty received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Carty:

Switzer-Carty Transportation Inc. (transportation): Chairman (since 2011); First Group America (transportation): Commercial Director, North America (2007 – 2008); Laidlaw Education Services (school bus transportation): President and Chief

Executive Officer (2006 – 2007), Executive Vice President and Chief Financial Officer, Laidlaw International Ltd. (2003 – 2006); Atlas Worldwide Holdings, Inc. (global air freight): Senior Vice President and Chief Financial Officer (2001 – 2003); Canadian Airlines Corp. (commercial airline): Senior Vice President and Chief Financial Officer (1996 – 2000); Current Director: Wajax Industries Ltd. (sales, parts and service of mobile equipment, industrial components and power systems); and Points International Ltd. (internet-based loyalty reward program management platform).

Mr. Carty has senior executive experience in the transportation industry, experience with financial restructurings, and experience on other corporate boards. This expertise informs his advice to our Board on the financial and operational issues we face.

### **Defendant Davidson**

43.     Defendant William R. Davidson ("Davidson") has served as a Company director since July 2014.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Davidson beneficially owned 30,195 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Davidson owned approximately $267,528 worth of YRC stock.

44.     For the fiscal year ended December 31, 2018, Defendant Davidson received $196,044 in compensation from the Company. This included $75,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Davidson received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Davidson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/7/2017 | 3,921 | $13.40 | $52,533 |
| 2/21/2017 | 3,800 | $13.11 | $49,818 |

46.     Thus, in total, before the fraud was exposed, he sold 7,721 Company shares on inside information, for which he received approximately $102,351. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Davidson:

> Trucking Management, Inc. (multi-employer bargaining arm of the unionized general freight trucking industry): Senior Director (since 2013); Virginia Health & Welfare and Pension Funds: Employer Chairman (since 2005); Western States Health & Welfare Trust Funds: Trustee (since 2002); Retired, though acting consultant in the trucking industry (2009 – 2013); Roadway Express, Inc. (motor freight carrier company): Corporate Vice President (2003 – 2009), Area Vice President of Labor Relations, Southern Division (1994 – 2003), Western Division (1985 – 1994).
>
> Mr. Davidson draws on his experience and knowledge of the trucking business with over 40 years in the industry. These inform his expertise in operational, union and labor relations matters.

**<u>Defendant Doheny</u>**

48.     Defendant Matthew A. Doheny ("Doheny") has served as a Company director since July 2011. He also serves as Chair of the Finance Committee and as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Doheny beneficially owned 71,659 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Doheny owned approximately $634,899 worth of YRC stock.

49.     For the fiscal year ended December 31, 2018, Defendant Doheny received $196,044 in compensation from the Company. This included $150,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December

31, 2017, Defendant Doheny received $222,289 in compensation from the Company. This included $90,000 in fees earned or cash paid and $132,289 in stock awards.

50.     The Company's 2018 Proxy Statement stated the following about Defendant Doheny:

> North Country Capital LLC (private investment firm): Founder and President (since 2011); HSBC Securities (USA), Inc.: Managing Director, Co-head of U.S. Special Situations Trading (2016-2017); Fintech Advisory Inc. (private investment firm): Portfolio Manager (2008 –2010); U.S. House of Representatives Candidate (2010 and 2012); Deutsche Bank Securities Inc. (investment bank): Managing Director, Distressed Assets Group (2000 – 2008); Kelley Drye & Warren LLP and Orrick, Herrington & Sutcliffe LLP: Bankruptcy Attorney (1995-2000); Current Director: Arcapita Inc. (private equity firm) (previously R.A. Holdings Corp.), Eastman Kodak Inc. (printing technology); Former Director: Affinity Gaming (casino operator), BridgeStreet Worldwide, Inc. (corporate housing provider).

> Mr. Doheny's financial expertise and experience as an investor in financial and operational turnarounds are a source of valuable insight to our Board on our financial structure and turnaround strategy.

**Defendant Friedman**

51.     Defendant Robert L. Friedman ("Friedman") has served as a Company director since July 2011.  He also serves as a member of the Finance Committee and as a member of the Audit & Ethics Committee.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Friedman beneficially owned 71,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Friedman owned approximately $634,899 worth of YRC stock.

52.     For the fiscal year ended December 31, 2018, Defendant Friedman received $226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Friedman received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Friedman:

> The Blackstone Group LP (investment and financial advisory firm): Senior Advisor (since 2012), Senior Managing Director (1999 – 2012), Chief Legal Officer (2003 – 2010) and Chief Administrative Officer (2003 –2007); Simpson Thacher & Bartlett (legal services): Partner (1975 – 1999); Current Director: Axis Capital Holdings Ltd. (insurance and reinsurance) and Harrington Reinsurance Holdings Limited (chairman of the board) (reinsurance); Former Director: Orbitz Worldwide, Inc. (travel products and services), TRW Automotive Holdings Inc. (automobile systems, components and modules), Corp Group Banking S.A. (banking), FGIC Corporation (insurance), Northwest Airlines, Inc. (airline), The India Fund, Inc. (closed end mutual fund), American Axle & Manufacturing, Inc. (automotive components), and Premcor Inc. (oil refining).
>
> Mr. Friedman has a unique combination of experience as a corporate lawyer and outside counsel to public companies and their boards on corporate governance and other legal matters, experience in financial and investment analysis as a senior officer of a leading investment firm, and experience as a current or former director of other public companies. Mr. Friedman draws on this experience to provide valuable guidance to our Board on our corporate governance, financial management, and legal and regulatory affairs.

**Defendant Hoffman**

54.     Defendant James E. Hoffman ("Hoffman") has served as a Company director since July 2011.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Hoffman beneficially owned 71,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Hoffman owned approximately $634,899 worth of YRC stock.

55.     For the fiscal year ended December 31, 2018, Defendant Hoffman received $306,044 in compensation from the Company. This included $185,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hoffman received $257,289 in compensation from the Company. This included $125,000 in fees earned or cash paid and $132,289 in stock awards.

56.     The Company's 2018 Proxy Statement stated the following about Defendant Hoffman:

> Retired (since 2015); 2001 Development Corporation (commercial office property development and redevelopment services): Executive Manager (2008 – 2015); Alliant Energy Business Development: Executive Vice President; Alliant Energy Resources, a subsidiary of Alliant Energy Corporation (electric and natural gas services): President (1998 – 2005); IES Industries Inc. (predecessor to Alliant Energy Corporation): Executive Vice President (1996 – 1998); IES Utilities Inc.: Executive Vice President (1995 – 1996); MCI Communications: Chief Information Officer (1993 – 1995) and Senior Vice President (1990 – 1993); Telecom USA (telecommunications): Executive Vice President (1988 – 1990). Mr. Hoffman is also a past chairman of the board of the Iowa Health System, the largest health care provider in the state of Iowa.

> Mr. Hoffman's executive leadership and restructuring and other board experience inform his counsel to the Board on the financial and operational issues we face and contribute to his effectiveness as our Board Chairman.

**Defendant Kneeland**

57.     Defendant Michael J. Kneeland ("Kneeland") has served as a Company director since July 2011.  He also serves as a member of the Compensation Committee and the Governance Committee.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Kneeland beneficially owned 71,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Kneeland owned approximately $634,899 worth of YRC stock.

58.     For the fiscal year ended December 31, 2018, Defendant Kneeland received $226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Kneeland received $211,039 in compensation from the Company. This included $78,750 in fees earned or cash paid and $132,289 in stock awards.

59.     The Company's 2018 Proxy Statement stated the following about Defendant Kneeland:

> United Rentals, Inc. (equipment rental): President and Chief Executive Officer (since 2008), Interim Chief Executive Officer (2007 – 2008), Executive Vice President and Chief Operating Officer (2007), Executive Vice President – Operations (2003 – 2007), Regional Vice President (2000 – 2004), and District Manager (1998 – 2000); Current Director: United Rentals, Inc. (equipment rental) and Anticimex (private Swedish pest control company).
>
> Mr. Kneeland is experienced in a number of substantive areas affecting our Company, including logistics, information technology, real estate, risk management, human resources and public company oversight and governance, from his tenure at a large, publicly-held corporation. Mr. Kneeland draws on this experience to provide our Board with valuable perspectives on the operational and strategic issues we face.

**Defendant Nazemetz**

60.     Defendant Patricia M. Nazemetz ("Nazemetz") has served as a Company director since March 2015.  She also serves as Chair of the Compensation Committee and as a member of the Governance Committee.   According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Nazemetz beneficially owned 33,111 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Nazemetz owned approximately $293,363 worth of YRC stock.

61.     For the fiscal year ended December 31, 2018, Defendant Nazemetz received $241,044 in compensation from the Company. This included $120,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Nazemetz received $218,539 in compensation from the Company. This included $86,250 in fees earned or cash paid and $132,289 in stock awards.

62.     The Company's 2018 Proxy Statement stated the following about Defendant Nazemetz:

NAZ DEC LLC (executive consulting firm): Principal and founder (since 2011); Xerox Corporation (document technology, services, software and supplies): Corporate Vice President and Chief Human Resources and Ethics Officer (2007 – 2011), Chief Human Resources Officer (1999 – 2007), other key roles in the human resources department (1979 – 1999); Current Director: Sterling Bancorp (bank holding company for Sterling National Bank); Former Director: Astoria Financial Corporation (holding company for Astoria Bank) (2013 – 2017); WMS Industries, Inc. (casino gaming machines manufacturer) (2007 – 2013); Energy East Corporation (electricity and natural gas distributor) (2007 – 2008).

Ms. Nazemetz's notable career in all areas of human resources management, including succession planning, executive compensation, employee benefits and other areas, bring valuable skills and insight to the Board. Further, Ms. Nazemetz has extensive experience with public company boards as well as serving on numerous non-profit boards throughout her career.

**Defendant Winestock**

63.     Defendant James F. Winestock ("Winestock") has served as a Company director since July 2011.  He also serves as Chair of the Governance Committee.  According to the 2018 Proxy Statement, as of March 5, 2018, Defendant Winestock beneficially owned 76,659 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 5, 2018 was $8.86, Defendant Winestock owned approximately $679,199 worth of YRC stock.

64.     For the fiscal year ended December 31, 2018, Defendant Winestock received $236,044 in compensation from the Company. This included $115,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Winestock received $217,289 in compensation from the Company. This included $85,000 in fees earned or cash paid and $132,289 in stock awards.

65.     The Company's 2018 Proxy Statement stated the following about Defendant Winestock:

Retired (since 2009); United Parcel Service, Inc. (package delivery and freight transportation): Senior Vice President for U.S. Operations and Global Security (2004 –2009), President and Chief Operating Officer, North Central Region (2000 – 2004), President and Chief Operating Officer, Midwest Region (1998 – 2000), and various other positions (1969 – 1998); Current Director: FirstGroup plc (train and bus transportation); Former Manager: AMP Americas (CNG developers).

Mr. Winestock draws on his knowledge of the transportation industry, gained from over 40 years of leadership experience at United Parcel Service, Inc., to provide our Board with valuable perspectives on the opportunities and challenges facing our industry and our operational, management and strategic issues.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66.      By reason of their positions as officers, directors, and/or fiduciaries of YRC and because of their ability to control the business and corporate affairs of YRC, the Individual Defendants owed YRC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage YRC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of YRC and its shareholders so as to benefit all shareholders equally.

67.      Each director and officer of the Company owes to YRC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of YRC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.      To discharge their duties, the officers and directors of YRC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of YRC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised YRC's Board at all relevant times.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of YRC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of YRC were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to YRC's own Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how YRC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of YRC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that YRC's operations would comply with all applicable laws and YRC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to YRC and the shareholders the duty of loyalty requiring that each favor YRC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of YRC and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with YRC, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by YRC.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of YRC, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of YRC and was at all times acting within the course and scope of such agency.

## **YRC'S CODE OF CONDUCT**

82.     The Company's Code of Business Conduct (the "Code of Conduct") states that it is "the core of our corporate legal compliance program and applies to all of us, including our

directors, officers, employees, representatives, agents, contractors, consultants, joint ventures, and

anyone acting on our behalf."

83.     The Code of Conduct provides, as to "Keeping Accurate Records," that:

We rely on our financial records to produce reports to the Board, management, stakeholders, lenders, government agencies and the public. These records must accurately reflect our assets, liabilities, financial condition and performance.

We must provide accurate and truthful information in all reports and records, including timekeeping records, trip logs, expense reports, business records, financial statements, and reports to lenders. If you are part of our Finance or Accounting organization, you have a special duty to ensure that our financial disclosures are full, fair, accurate, timely and understandable.

* * *

All transactions must be recorded with care and honesty, and be supported by adequate documentation to permit review and audit.

If you are unsure how to properly record a transaction, you should contact your supervisor.

Each person at the Company – not just those in Finance – has a role in making sure that money is appropriately spent, our financial records are complete and accurate and internal controls are honored. To make sure that we get this right, the Company maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements at every location in which we operate. Stay in full compliance with our system of internal controls, and don't hesitate to contact our Legal Department or Finance if you have any questions.

We must never be involved in:

•   Submitting false invoices or expense reports
•   Forging or altering checks or misdirecting payments
•   Unauthorized handling, or false or misleading reporting, of transactions
•   Creating or manipulating financial information so as to artificially inflate, depress, distort or conceal financial results
•   Intentionally misclassifying transactions between accounts, departments or accounting periods
•   Failing to record transactions in the proper account or accounting period
•   Keeping secret or special books, records or accounts
•   Improperly overriding or working around our system of internal controls
•   Improper or fraudulent interference with, coercion, manipulation or misleading of, internal or external auditors or the Audit & Ethics Committee

24

84.     The Code of Conduct provides, as to "Transparency and Full Disclosure," that:

Transparency and full disclosure of our financial condition, operating results and significant risks and events are critical to our integrity and required by law. They depend upon the validity, accuracy and completeness of the information upon which our accounts, records and financial statements are based and the effectiveness of our internal accounting and disclosure controls. If you are involved in preparing, processing or recording such information, you must take responsibility for its accuracy and integrity. Our public communications, including filings with the SEC and communications with stakeholders, lenders and analysts, must be fair, accurate, timely, complete and understandable. If you are involved in our SEC reporting process, and especially if you are a senior officer in Finance or Accounting or a person with supervisory responsibilities for our public disclosure documents, you must act in furtherance of this requirement. In particular, you are required to be familiar and comply with all SEC disclosure rules and guidance and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about us, or knowingly making any misleading statements, in our public disclosures or otherwise. If you have any of these responsibilities, you must strictly comply with all internal controls and procedures for preparing public disclosures. Finance and Accounting employees must record, classify and summarize all transactions in accordance with our internal control procedures, GAAP, and applicable securities laws and regulations. We must never create, or encourage others to create, records that are intended to mislead others or conceal improper activity or adverse results.

85.     The Code of Conduct provides, as to "Insider Trading," that:

Trading in our securities (common stock or public notes), or the securities of our publicly-traded Customers, suppliers, Business Partners or Transaction Parties, while in possession of material, nonpublic information about them or us, or disclosing that information to others for trading purposes, is against the law and a violation of this Code. See our Securities Trading and Disclosure Policy for a definition of material, nonpublic information and the laws and policies governing trading in our and others' securities. Any person failing to comply with our Securities Trading and Disclosure Policy or insider trading laws will be subject to disciplinary action, including termination of employment or other business relationship, and can also be subject to civil and criminal liability.

86.     The Individual Defendants violated the Code of Conduct by engaging in the scheme

to issue materially false and misleading statements to the public and to facilitate and disguise the

Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate

assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Moreover, certain of the Individual Defendants engaged in insider sales in violation of the Code of Conduct.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

87.     YRC is a holding company that, through its operating subsidiaries, offers its customers a wide range of transportation services.  The Company also offers expertise in heavyweight shipments and flexible supply chain solutions to help its customers ship industrial, commercial, and retail goods.

88.     The Company's reporting segments include: YRC Freight, which focuses on longer haul business opportunities with national, regional, and international services, and Regional Transportation, which is for the Company's transportation service providers focused on business opportunities in the regional and next-day delivery markets.

89.     The Company's YRC Freight reporting segment provides operations results for YRC Freight, the entity resulting from a 2009 merger between Yellow Transportation and Roadway Express.

**The Reweighing Misconduct**

90.     From September 2005 to at least October 2013, the Individual Defendants caused YRC Freight, Roadway Express, and Yellow Transportation to engage in a fraudulent scheme to use inflated cargo weights to deliberately overcharge its customers, including the DOD, for freight services.

91.     In 2005, Roadway Express and Yellow Transportation, as part of an effort to increase their revenue, would check the weight of each load of cargo that passed through their respective freight terminals.  These companies' revenue depended in large part on the weight of shipments, and higher weight usually meant more revenue.  If Roadway Express and Yellow

Transportation performed a "positive reweigh correction," and the weight verification, or "reweigh," showed that a shipment was heavier than the stated weight, the companies would usually receive more revenue as a result after correcting the weight.

92.     On the same token, a "negative reweigh correction," following a reweigh showing that the shipment was lighter than stated, would typically reduce the price of the shipment after correction and thus the companies' revenue.

93.     Overall, the practice of reweighing shipments resulted in more positive reweigh corrections than negative corrections, leading to increased earnings.

94.     In September 2005, Roadway Express ceased making negative reweigh corrections. Roadway Express, however, would continue making positive reweigh corrections, i.e., correct weights if the reweigh showed that it could charge its customers more.  When negative reweighs showed that customers should receive a credit or discounts, Roadway Express would not correct the weight.

95.     Yellow Transportation in early 2006 began following a similar practice, failing to correct inaccurate weights if the weighing error was to its advantage.

96.     Following the 2009 merger between Roadway Express and Yellow Transportation, YRC Freight continued to systematically engage in a practice of suppressing negative reweigh corrections for its DOD shipments until at least October 2013.  This fraudulent practice also extended to the Company's other customers.

97.     These practices violated rules governing tender agreements between the DOD and the companies, which required that the companies would correct any discrepancies uncovered during reweighing.

98.     Evidence obtained through the DOD Action reveal that YRC Freight, Roadway Express, and Yellow Transportation knew that their reweigh practices were wrong and that they were utilizing a policy of overcharging customers by voiding negative reweigh results.  Moreover, evidence obtained in the DOD Action revealed that YRC Freight, Roadway Express, and Yellow Transportation were deliberately concealing evidence of the Reweighing Misconduct.

99.     On October 3, 2005, a senior manager at Roadway Express named Dean Frye sent a widely distributed internal email noting the implementation of a policy change which "eliminate[d] the automated issuance of negative weight corrections," and that, with a few exceptions, "[n]egative weight corrections will no longer be [made]."

100.    Also on October 3, 2005, Joe Whitsel, Vice President for Revenue Management at Yellow Roadway Enterprise Services, which was overseeing the Roadway Express-Yellow Transportation merger, told Mike Smid, the President and CEO of Roadway Express that "we are recommending that Yellow follow Roadway's lead and implement the elimination of the negative revenue adjustments."  Smid replied by saying he was not sure he agreed with a total cessation and that there was "a right number in order to give our [reweigh] program some credibility."

101.    After contemplating different possibilities, Keith Rawson, then Senior Director for Revenue Management for Yellow Roadway Enterprise Services, recommended, "if we are going to do it, let's go all the way."  On or around February 27, 2006, Yellow Transportation ceased to make negative reweigh corrections.

102.    In a March 1, 2006 email in response to Yellow Transportation employees' questions, Hugh Gaynor, a Revenue Management executive at Yellow Transportation, stated that Roadway Express had not been making negative reweigh corrections for six months and that "Yellow Senior Management has decided to follow suit and not process negative adjustments."

Gaynor moreover noted that "[t]his information is for your use only and should not be communicated outside of our team."

103.    Through the Reweighing Misconduct, YRC Freight, Roadway Express, and Yellow Transportation knowingly overcharged its customers and submitted thousands of false claims to the DOD that used inflated weights to overcharge the government.  The invoices submitted to the DOD falsely represented shipment weights which were higher than the actual weights measured, and led to inflated charges.

104.    To further their scheme, they knowingly made false and misleading statements to the DOD to induce the government to give them business and to dodge their contractual obligations to correct inflated invoices and return overpayments.

105.    Between September 2005 and June 2010, YRC Freight, Roadway Express, and Yellow Transportation did not keep a record of the negative reweigh corrections they systematically cancelled, and from at least June 2009 to June 2010, they concealed evidence of their misconduct by programming their computer system so negative reweigh results would not register.

106.    When soliciting business from the DOD, YRC Freight, Roadway Express, and Yellow Transportation falsely promised that they would comply with applicable rules and that they would, in some instances, correct discrepancies in billed weights revealed through a reweigh.  Such false promises were made in the tenders for freight services submitted by the companies to the DOD.

107.    Contracts entered into in 2006 between the DOD and Yellow Transportation and Roadway Express required the companies "to immediately notify the Contracting Officer and request instructions for disposition of the overpayment" upon learning of DOD overpayment on

an invoice.  YRC Freight, Roadway Express, and Yellow Transportation, instead utilized false and misleading statement and invoices to submit false claims to the government, knowingly concealing and avoiding their obligations to return payment.  The companies made certain that the DOD and its other customers would unknowingly overpay for shipments by not making negative reweigh corrections despite knowing that the corrections were warranted.  Thus, many of the weights provided on invoices to customers were false and still used to charge customers.

108.    As a result of the Reweighing Misconduct, the DOD overpaid millions of dollars for freight shipping, and seeks treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, in the DOD Action.

**False and Misleading Statements**

*March 10, 2014 Form 10-K*

109.    On March 10, 2014, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2013 (the "2013 10-K"), signed by Defendants Welch, Pierson, Fisher, Bromark, Carty, Doheny, Friedman, Hoffman, Kneeland, and Winestock.

110.    The 2013 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

*Revenue Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance by management and investors. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

In addition, YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional

Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2013 and 2012, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $26.6 million and $20.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based on historical trends. At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

111.     Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Welch and Pierson, attesting to the accuracy of the 2013 10-K.

**March 18, 2014 Proxy Statement**

112.     On March 18, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement"). Defendants Welch, Bromark, Carty, Doheny, Friedman, Hoffman, Kneeland,

and Winestock solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

113.    The 2014 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.   The 2014 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

114.    The Individual Defendants also caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

115.    The 2014 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.

***February 20, 2015 Form 10-K***

116.    On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K"), signed by

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, and Winestock.

117.   The 2014 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

**Revenue Reserves**

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance by management and investors. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

In addition, YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2014 and 2013, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $27.1 million and $26.6 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating

occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2014 and 2013, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively.

118.    Attached to the 2014 10-K were SOX certifications signed by Defendants Welch and Pierson, attesting to the accuracy of the 2014 10-K.

***March 17, 2015 Proxy Statement***

119.    On March 17, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, and Winestock solicited the 2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

120.    The 2015 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.   The 2015 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

121.    The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

122.    The 2015 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.

### *February 18, 2016 Form 10-K*

123.    On February 18, 2016, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K"), signed by Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

124.    The 2015 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### *Revenue Recognition and Revenue-related Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2015 and 2014, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $24.0 million and $27.1 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively.

125.     Attached to the 2015 10-K were SOX certifications signed by Defendants Welch and Pierson, attesting to the accuracy of the 2015 10-K.

**March 17, 2016 Proxy Statement**

126.     On March 17, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

127.     The 2016 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.   The 2016 Proxy Statement was false and

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

128.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

129.    The 2016 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.

### *February 17, 2017 Form 10-K*

130.    On February 17, 2017, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Welch, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

131.    The 2016 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### *Revenue Recognition and Revenue-related Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive

system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2016 and 2015, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $25.0 million and $24.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2016 and 2015, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively.

132.    Attached to the 2016 10-K were SOX certifications signed by Defendants Welch and Fisher, attesting to the accuracy of the 2016 10-K.

**March 21, 2017 Proxy Statement**

133.    On March 21, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman,

Kneeland, Nazemetz, and Winestock solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

134.     The 2017 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.   The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

135.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

136.     The 2017 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.

***February 15, 2018 Form 10-K***

137.     On February 15, 2018, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2017 (the "2017 10-K"), signed by

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Defendants Welch, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

138.    The 2017 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### Revenue Recognition and Revenue-related Reserves

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2017 and 2016, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $28.1 million and $25.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.,* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the

following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.

139.     Attached to the 2017 10-K were SOX certifications signed by Defendants Welch and Fisher, attesting to the accuracy of the 2017 10-K.

### *March 19, 2018 Proxy Statement*

140.     On March 19, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

141.     The 2018 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

142.     The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

143.    The 2018 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.

**The Truth Emerges**

144.    On December 14, 2018, the DOJ issued a press release announcing that the United States had filed a complaint against YRC Freight, Roadway Express, and Yellow Transportation for "systematically overcharg[ing] the government" and "ma[king] false statements to the government that hid their misconduct[.]"

145.    The press release provided, in relevant part:

**United States Sues Freight Companies for Systematic Overcharging of Shipments**

The United States has filed a complaint in the Western District of New York against YRC Freight Inc., (YRC); Roadway Express Inc. (Roadway); and Yellow Transportation Inc. (Yellow), alleging that these companies systematically overcharged the government for freight carrier services and made false statements to the government that hid their misconduct, the Justice Department announced today.

The United States filed this lawsuit in U.S. District Court in Buffalo, New York. The United States alleges that, for more than seven years, the defendants defrauded the Department of Defense by millions of dollars for shipments that were actually lighter, and thus cheaper, than the weights for which the defendants charged the government. The United States further alleges that the defendants knowingly made or used false statements concealing their overcharging practices to the Department of Defense.

"Those who do business with the government must do so fairly and honestly," said Assistant Attorney General Jody Hunt of the Department of Justice's Civil Division. "Knowingly overcharging the government is an affront to American taxpayers, and the Department of Justice will seek to ensure that those who engage in such misconduct are held accountable."

146.    The press release discussed specific allegations against the companies, stating, in

relevant part:

> Specifically, the United States' lawsuit alleges that the defendants reweighed
> thousands of shipments and suppressed the results whenever they indicated that a
> shipment was actually lighter than its original estimated weight. Thus, instead of
> charging the Department of Defense for shipments based on the correct weight, the
> defendants knowingly billed the government (and their other customers) based on
> weights that they knew to be inflated. The defendants also allegedly made false
> statements to induce the Department of Defense to use them as freight carriers and
> further knowingly made or used false statements to improperly avoid their
> obligations to correct inflated invoices and return overpayments.
>
> "When a federal agency, such as the Department of Defense, enters into a service
> contract with a private corporation or company, the expectation is that the
> agreement will be administered in good faith," stated U.S. Attorney James P.
> Kennedy Jr. for the Western District of New York. "In this case, YRC did not
> legally fulfill its agreed upon obligations to the Defense Department, choosing
> instead to line its pockets with tax payer's dollars. Such actions are fraudulent and
> illegal. This case should serve as a warning to any organization that enters into a
> contract with the federal government —if you try to rip us off, be prepared to pay
> a heavy price."
>
> "This complaint is the result of a successful investigation to identify those who seek
> to profit by defrauding the Defense Department," stated Leigh-Alistair Barzey,
> Special Agent-in-Charge, Defense Criminal Investigative Service (DCIS),
> Northeast Field Office. "DCIS will continue to investigate procurement fraud
> allegations, along with its law enforcement partners, in order to protect U.S.
> military members and the American tax payer."

147.    The press release moreover discussed that the companies were subject to treble

damages and civil penalties and the governmental bodies that took part in the investigation, stating,

in relevant part:

> The original lawsuit in this case was filed by James Hannum under the *qui tam*, or
> whistleblower, provisions of the False Claims Act. Under the act, private citizens
> can bring suit on behalf of the United States for false claims and share in any
> recovery. The act permits the government to intervene in such lawsuits, as it has
> done here. Those who violate the act are subject to treble damages and civil
> penalties.
>
> This matter was investigated by the Civil Division's Commercial Litigation
> Branch, the U.S. Attorney's Office for the Western District of New York, the

Defense Criminal Investigative Service, and the United States Army Criminal Investigation Division Command.

148.   Also on December 14, 2018, *The Wall Street Journal* published an article titled, "U.S. Sues Freight Carrier YRC Over Military Shipments," noting that the "trucking company overcharged by 'millions of dollars' over several years." The article stated, in relevant part:

> The Justice Department is suing a major U.S. freight carrier, alleging that trucking units of YRC Worldwide Inc. overcharged the Pentagon millions of dollars for shipping over several years.
>
> The department said in the lawsuit filed earlier this week that YRC Freight Inc., Roadway Express Inc. and Yellow Transportation Inc. made false statements to the government and defrauded the Department of Defense by inflating weight measurements on bills.
>
> For more than seven years, from 2005 to at least 2013, workers for the companies reweighed thousands of shipments and didn't disclose the results when those weights came in under the original estimate, the lawsuit alleges.
>
> "When a federal agency, such as the Department of Defense, enters into a service contract with a private corporation or company, the expectation is that the agreement will be administered in good faith," U.S. Attorney James P. Kennedy Jr. said in a statement.
>
> * * *
>
> It isn't uncommon to find billing errors of 3% to 5% with freight carriers, said Harold Friedman of Data2Logistics, a Fort Myers, Fla.-based company that arranges for payments between shipping companies and their customers. But improved technology in payment systems should reduce those errors, Mr. Friedman said. "It's amazing to me that carriers can't bill more accurately in today's automated environment."
>
> A whistleblower who worked for Roadway and YRC for more than 30 years filed the original complaint in federal court in Buffalo, N.Y. in 2008. Those allegations spurred the government's investigation, which led to this week's filing. The lawsuit included internal communications from the companies detailing what prosecutors called "dishonest reweigh practices [that] caused them to submit false claims to DOD."
>
> The charges were investigated by the Justice and Defense departments, including the U.S. Army's Criminal Investigation Division Command. Ms. Lynch said one of the challenges investigators faced was that YRC allegedly concealed the true

weight of the loads they were carrying. "They discarded negative weight corrections," which made it difficult to estimate the full value of the misstated bills, she said.

149.    On this news, the price per share of YRC stock fell approximately $1.26, or approximately 28.4%, from the previous day's closing price, closing at $3.17 on December 14, 2018.

150.    The statements in ¶¶ 109-111, 116-118, 123-125, 130-132, and 137-139 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, that: (1) the Company was engaged in the Reweighing Misconduct; (2) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liabilities; and (3) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## DAMAGES TO YRC

151.    As a direct and proximate result of the Individual Defendants' conduct, YRC has lost and expended, and will lose and expend, many millions of dollars.

152.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153.    Such expenditures include, but are not limited to, legal fees, treble damages, and civil penalties associated with the DOD Action filed against the Company's subsidiaries, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

154.   Such expenditures include, but are not limited to, legal fees associated with additional actions filed against the Company by its customers to recoup the amounts they were overcharged through the Reweighing Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

155.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

156.   As a direct and proximate result of the Individual Defendants' conduct, YRC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

157.   Plaintiff brings this action derivatively and for the benefit of YRC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of YRC, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

158.   YRC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.   Plaintiff is, and has continuously been at all relevant times, a shareholder of YRC. Plaintiff will adequately and fairly represent the interests of YRC in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

160.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

161.    A pre-suit demand on the Board of YRC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following 10 Individual Defendants: Defendants Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock (collectively, the "Director-Defendants"), and non-party Darren D. Hawkins ("Hawkins") (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the 10 Directors that were on the Board at the time this action was commenced.

162.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to cause the Company to engage in the Reweighing Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the Reweighing Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties,

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164.    Additional reasons that demand on Defendant Bromark is futile follow. Defendant Bromark has served as a Company director since July 2011 and serves as Chairman of the Audit & Ethics Committee. He receives handsome compensation, including $251,044 in 2018 and $232,289 in 2017.  As a long-time director and Chairman of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bromark signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Bromark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Carty is futile follow. Defendant Carty has served as a Company director since July 2011 and serves as a member of the Audit & Ethics Committee, the Compensation Committee, and the Finance Committee. He receives handsome compensation, including $226,044 in 2018 and $207,289 in 2017.  As a long-time director and member of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Carty signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. Defendant Carty was appointed to the Board by the

International Brotherhood of Teamsters, who own 100% of the Company's Series A Preferred Stock, and as a result can elect two members to the Board. For these reasons, too, Defendant Carty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since July 2014. He receives handsome compensation, including $196,044 in 2018 and $267,528 in 2017. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Davidson signed, and thus personally made the false and misleading statements in, the 2014-2017 10-Ks. Defendant Davidson was appointed to the Board by the International Brotherhood of Teamsters, who own 100% of the Company's Series A Preferred Stock, and as a result can elect two members to the Board. For these reasons, too, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Doheny is futile follow. Defendant Doheny has served as a Company director since July 2011 and serves as Chair of the Finance Committee and as a member of the Compensation Committee. He receives handsome compensation, including $271,044 in 2018 and $222,289 in 2017. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded

his duties to protect corporate assets. Furthermore, Defendant Doheny signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Doheny breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Friedman is futile follow. Defendant Friedman has served as a Company director since July 2011 and serves as a member of the Finance Committee and as a member of the Audit & Ethics Committee. He receives handsome compensation, including $226,044 in 2018 and $207,289 in 2017.  As a long-time director and member of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Friedman signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Friedman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Hoffman is futile follow. Defendant Hoffman has served as a Company director since July 2011.  He receives handsome compensation, including $306,044 in 2018 and $257,289 in 2017.  As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hoffman signed, and thus personally made the false and

misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Hoffman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant Kneeland is futile follow. Defendant Kneeland has served as a Company director since July 2011 and serves as a member of the Compensation Committee and the Governance Committee. He receives handsome compensation, including $226,044 in 2018 and $211,039 in 2017.  As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kneeland signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Kneeland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Nazemetz is futile follow. Defendant Nazemetz has served as a Company director since March 2015 and serves as Chair of the Compensation Committee and as a member of the Governance Committee.  She receives handsome compensation, including $241,044 in 2018 and $218,539 in 2017.  As a trusted director she conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Nazemetz signed, and thus personally made the false and misleading statements in, the 2015-2017 10-Ks. For these

reasons, too, Defendant Nazemetz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Winestock is futile follow. Defendant Winestock has served as a Company director since July 2011 and serves as Chair of the Governance Committee. He receives handsome compensation, including $236,044 in 2018 and $217,289 in 2017.  As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Winestock signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Winestock breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Hawkins is futile follow.  Hawkins has served as the Company's CEO since July 2018.  Thus, he is a non-independent director. The Company provides Defendant Hawkins with his principal occupation  For these reasons, too, Hawkins is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on the Board is futile follow.

175.    Demand in this case is excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the

Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

176.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Reweighing Misconduct and the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

177.    YRC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for YRC any part of the damages YRC suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

178.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

179.    The acts complained of herein constitute violations of fiduciary duties owed by YRC officers and directors, and these acts are incapable of ratification.

180.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of YRC. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of YRC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

181.    If there is no directors' and officers' liability insurance, then the Directors will not cause YRC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

182.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

185.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

186.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

187.    Under the direction and watch of the Directors, the 2014-2018 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) the Company engaged in the Reweighing Misconduct; (2) the Company's misconduct would subject it to heightened regulatory scrutiny, including from the SEC; and (3) the Company failed to maintain internal controls.

188.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct, and therefore any compensation based on the Company's financial performance was artificially inflated.

189.    The Proxy Statements also stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC.  The Proxy Statements were false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

190.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

191.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman,

Kneeland, Nazemetz, and Winestock, which allowed them to continue breaching their fiduciary duties to YRC.

192.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

193.    Plaintiff on behalf of YRC has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of YRC's business and affairs.

196.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

197.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of YRC.

198.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Reweighing Misconduct.

199.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

200.    In breach of their fiduciary duties owed to YRC, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company engaged in the Reweighing Misconduct; (2) the Company's misconduct would subject it to heightened regulatory scrutiny, including from the SEC; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

201.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

202.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

203.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were

not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

204.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, YRC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206.    Plaintiff on behalf of YRC has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

207.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, YRC.

209.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from YRC that was tied to the performance or

artificially inflated valuation of YRC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

210.    Plaintiff, as a shareholder and a representative of YRC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

211.    Plaintiff on behalf of YRC has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

214.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

215.    Plaintiff on behalf of YRC has no adequate remedy at law.

## PRAYER FOR RELIEF

216.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of YRC, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to YRC;

(c)     Determining and awarding to YRC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing YRC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect YRC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of YRC to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding YRC restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2019

Respectfully submitted,

**WALTERS RENWICK RICHARDS
SKEENS & VAUGHAN, P.C.**

*s/ Karen W. Renwick*_____
KAREN W. RENWICK, Ks. Bar #12095
R. FREDERICK WALTERS, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, Missouri 64105
Telephone: (816) 421-6620
Facsimile: (816) 421-4747
Email: krenwick@wrrsvlaw.com
          fwalters@wrrsvlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Dalton Hastey , am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under hte laws of the United States of America that the foregoing is true and correct.  Executed this _th day of 5/26/2019, 2019.

DocuSigned by:

D Hastey

6189A248B0C941E...

Dalton Hastey