## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| DALTON HASTEY, derivatively on behalf of YRC WORLDWIDE INC., | |
| Plaintiff, | Case No.: 19-2266-DDC-KGG |
| v. | **DEMAND FOR JURY TRIAL** |
| JAMES L. WELCH, JAMIE G. PIERSON, DARREN D. HAWKINS, STEPHANIE D. FISHER, RAYMOND J. BROMARK, DOUGLAS A. CARTY, WILLIAM R. DAVIDSON, MATTHEW A. DOHENY, ROBERT L. FRIEDMAN, JAMES E. HOFFMAN, MICHAEL J. KNEELAND, PATRICIA M. NAZEMETZ, and JAMES F. WINESTOCK, | |
| Defendants, | |
| and | |
| YRC WORLDWIDE INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

## INTRODUCTION

Plaintiff Dalton Hastey ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant YRC Worldwide Inc. ("YRC" or the "Company"), files this Verified Shareholder Derivative Amended Complaint against Individual Defendants James L. Welch, Jamie G. Pierson, Darren D. Hawkins, Stephanie D. Fisher, Raymond J. Bromark, Douglas A. Carty, William R. Davidson, Matthew A. Doheny, Robert L. Friedman, James E. Hoffman, Michael J. Kneeland, Patricia M. Nazemetz, and James F. Winestock (collectively, the "Individual Defendants," and together with YRC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of YRC, unjust enrichment, waste of corporate assets, and violation of

1

Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding YRC, legal filings, news reports, securities analysts' reports and advisories about the Company, pleadings in other actions filed against YRC and/or its subsidiaries and other Individual Defendants, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by YRC's directors and/or officers from at least March 10, 2014 through the present (the "Relevant Period").

2.      YRC is a holding company that, through its operating subsidiaries, offers its customers a wide range of transportation services. The Company also offers expertise in heavyweight shipments and flexible supply chain solutions to help its customers ship industrial, commercial, and retail goods. The Company's reporting segments focus on longer haul business opportunities with national, regional, and international services, and on business opportunities in the regional and next-day delivery markets.

3.      YRC focuses on less-than-truckload ("LTL") shipping, which combines shipments from multiple customers on a single trailer. The Company's largest subsidiary is YRC, Inc. ("YRC Freight"), the LTL entity resulting from a 2009 merger between Yellow Transportation, Inc.

("Yellow Transportation") and Roadway Express, Inc. ("Roadway Express"). YRC Freight provides a wide range of LTL and truckload services for transporting industrial, commercial and retail goods in national, regional and international markets through its North American ground distribution network. YRC Freight's customers include manufacturers, wholesalers, retailers, and government customers throughout North America. YRC Freight employs approximately 19,000 individuals and owns 126 service facilities throughout North America where shipments are weighed and processed for delivery. The Company determines the pricing of shipments for its customers based primarily on the weight, general classification of the product, the shipping destination, and any customer discounts, and employs a number of individuals to coordinate and manage the inspecting and weighing of these shipments. These employees are overseen by YRC's senior officers and management at the Company's headquarters in Overland Park, Kansas.

4.      A significant portion of the Company's business flowed from its shipping contracts with the U.S. government, which included contracts with the U.S. Department of Defense (the "DOD"), the General Services Administration, the U.S. department of Energy, the U.S. Department of Veterans Affairs, Federal Prison Industries, and the U.S. Census. The Company also has over 250,000 customers, including large corporations such as Wal-Mart Inc., The Home Depot, Inc., Amazon.com, Inc., Toyota Motor Corporation, General Electric Company, and Philips Healthcare.

5.      YRC was originally known as Yellow Corporation, with Yellow Transportation as its largest subsidiary. In 2003, Yellow Corporation acquired Roadway Express, and changed its name to the Yellow Roadway Corporation. The Yellow Roadway Corporation subsequently changed its name to YRC Worldwide Inc. in 2006.

6.     From 2003 until 2009, Roadway Express and Yellow Transportation operated for the most part as separate entities, although they shared certain corporate functions, including what the management of both entities considered to be "best practices."

7.     From at least September 2005, through the Relevant Period, according to internal Company emails, the Individual Defendants, as well as the management of Roadway Express, Yellow Transportation, and YRC Freight, concocted, executed and/or endorsed a scheme to fraudulently overcharge the Company's customers, including the DOD, for shipments that were lighter, and therefore cheaper, than the weights for which they were charged. Specifically, beginning in 2005, when Roadway Express employees reweighed a shipment, and the reweighing indicated that the shipment was lighter than the weight stated on the shipment's invoice, Roadway Express would not correct the weight, and would instead charge the customer for the heavier, incorrect weight. This scheme was extensive, and extended to most of Roadway Express's shipping operations, including its computer systems, which were specifically programmed not to register such weight corrections. Yellow Transportation, at the time helmed by Defendant Welch, adopted this scheme as a best practice in early 2006, and YRC Freight followed suit after Roadway Express and Yellow Transportation merged in 2009 (collectively, the "Reweighing Misconduct"). The Company generated at least $2 million per month by way of this fraudulent scheme, causing its financial statements during the Relevant Period to include, *inter alia*, overstated revenue and unstated losses.

8.     As a result of the Reweighing Misconduct, from at least September 2005 through October 2013, YRC Freight, Yellow Transportation, and Roadway Express violated the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA") by systematically overcharging the DOD for

freight carrier services and by failing to comply with the contractual terms of freight contracts between the DOD and the Company and related government procurement rules.

9.      In November 2008, James Hannum ("Hannum"), a supervisor at Roadway Express' Tonawanda, New York facility, filed a whistleblower lawsuit under seal captioned *United States ex rel. Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc*., Civil Action No. 08-cv-0811 (W.D.N.Y.) (the "DOD Action").[1] Hannum alleged, based on his personal knowledge, that YRC systematically overcharged its customers, including the DOD.

10.     In or around 2009, the Department of Justice ("DOJ") began an investigation of the Company relating to the Reweighing Misconduct (the "DOJ Investigation"). The DOJ Investigation was conducted pursuant to a Civil Investigative Demand ("CID"), a request for information or documents relevant to a government investigation. The issuance of a CID from the DOJ put the Individual Defendants on notice that the Company was being investigated over serious wrongdoing.

11.     In connection with the DOJ Investigation, the DOJ interviewed or deposed at least 32 witnesses, including Company employees such as Defendant Welch, obtained thousands of internal documents from the Company pertaining to DOD shipments affected by the Reweighing Misconduct, and extensively interacted with the Company's leadership through meetings and negotiations.

12.     A number of former Company employees further attested to the extent of the Reweighing Misconduct, supporting the claim that the Company routinely overcharged its larger customers such as Wal-Mart Inc. and The Home Depot, Inc., and actively incentivized its employees to make as many reweighs as possible.

---

[1] Attached hereto as Exhibit A is the initial qui tam complaint filed by Hannum in the DOD Action.

13.     During the Relevant Period, the Individual Defendants conspired to conceal the Reweighing Misconduct and its effects, including the DOJ Investigation, from the investing public in each of the Company's public statements and filings with the SEC and continually misrepresented that YRC's financial statements adhered to Generally Accepted Accounting Principles ("GAAP").

14.     On December 14, 2018, the DOJ issued a press release announcing that the United States had filed a complaint in intervention in the DOD Action against YRC Freight, Roadway Express, and Yellow Transportation "alleging that these companies systematically overcharged [the Department of Defense] for freight carrier services and made false statements to the government that hid their misconduct."[2]  According to the press release, the DOD Action was the result of "'a successful investigation to identify those who seek to profit by defrauding the Defense Department' . . . [t]his matter was investigated by the Civil Division's Commercial Litigation Branch, the U.S. Attorney's Office for the Western District of New York, the Defense Criminal Investigative Service, and the United States Army Criminal Investigation Division Command."

15.     On this news, the price per share of YRC stock fell $1.26, or approximately 28.4%, from the previous day's closing price of $4.43, to close at $3.17 on December 14, 2018.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose,

---

[2] Attached hereto as Exhibit B is the United States' complaint in intervention filed in the DOD Action.

*inter alia*, that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its revenue as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.     The Individual Defendants additionally breached their fiduciary duties by causing the Company to engage in the Reweighing Misconduct.

19.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

20.     Furthermore, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $10 million.

21.     In light of the Individual Defendants' misconduct, which has subjected YRC, its Chief Executive Officer ("CEO"), its former CEO, its Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of New York (the "Securities Class Action"), YRC Freight to being named as a defendant in the DOD Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of

the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

22.      In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the current and former CEOs' and CFOs' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of YRC's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

24.      Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

29.     Venue is proper in this District because YRC and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of YRC common stock. Plaintiff has continuously held YRC common stock at all relevant times.

### Nominal Defendant YRC

31.     YRC is a Delaware corporation with its principal executive offices at 10990 Roe Avenue, Overland Park, Kansas 66211. YRC's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "YRCW."

### Defendant Welch

32.     Defendant James L. Welch ("Welch") served as the Company's CEO from July 2011 to April 2018 and as a Company director from July 2011 to July 2018. Defendant Welch also served as President of YRC Freight from September 2013 through February 2014, and as President of Yellow Transportation from 2000 through 2007. According to the Company's Schedule 14A filed with the SEC on April 25, 2019 (the "2019 Proxy Statement"), as of August 1, 2018, Defendant Welch beneficially owned 346,695 shares of the Company's common stock, which

represented 1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on August 1, 2018 was $9.20, Defendant Welch owned approximately $3.18 million worth of YRC stock.

33.     For the fiscal year ended December 31, 2018, Defendant Welch received $4,331,248 in compensation from the Company. This included $525,000 in salary, $1,485,829 in stock awards, $2,237,813 in non-equity incentive plan compensation, and $82,606 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Welch received $2,191,739 in compensation from the Company. This included $891,667 in salary, $1,244,971 in stock awards, $29,000 for change in pension value, and $26,101 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Welch received $3,398,211 in compensation from the Company. This included $850,000 in salary, $2,523,065 in stock awards, $19,000 for change in pension value, and $6,146 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Welch received $5,215,543 in compensation from the Company. This included $850,000 in salary, $2,581,149 in stock awards, $1,774,375 in non-equity incentive plan compensation, and $10,019 in all other compensation. For the fiscal year ended December 31, 2014, Defendant Welch received $10,795,025 in compensation from the Company. This included $815,000 in salary, $9,855,537 in stock awards, $109,000 for change in pension value, and $14,988 in all other compensation.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Welch made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/13/2017 | 50,000 | $12.32 | $616,000 |
| 11/10/2017 | 50,000 | $12.16 | $608,000 |
| 2/17/2017 | 100,000 | $13.14 | $1,314,000 |

| 8/31/2016 | 19,918 | $11.61 | $231,247 |
| 8/6/2015 | 41,107 | $20.08 | $825,469 |
| 8/5/2016 | 42,346 | $12.32 | $521,702 |
| 8/4/2015 | 40,000 | $20.13 | $805,280 |
| 12/1/2014 | 8,300 | $24.01 | $199,249 |
| 11/28/2014 | 1,700 | $24.26 | $41,248 |
| 11/25/2014 | 10,000 | $23.80 | $238,050 |
| 11/24/2014 | 10,194 | $23.52 | $239,722 |
| 11/14/2014 | 10,000 | $23.75 | $237,500 |

35.     Thus, in total, before the fraud was exposed, he sold 383,565 Company shares on inside information, for which he received almost $5.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36.     The Company's Schedule 14A filed with the SEC on March 19, 2018 (the "2018 Proxy Statement") stated the following about Defendant Welch:

> YRC Worldwide Inc.: Chief Executive Officer (since 2011); Dynamex Inc. (transportation and logistics services): President and Chief Executive Officer (2008 – 2011); JHT Holdings (truck transportation): Interim Chief Executive Officer (2007 – 2008); Yellow Transportation Inc. (subsidiary of our Company): President and Chief Executive Officer (2000 – 2007), and various other positions (1978 – 2000); Current Director: SkyWest Inc. (regional airline); Former Director: Dynamex Inc., Spirit AeroSystems Holdings Inc. (commercial airplane assemblies and components), Roadrunner Transportation (transportation and logistics services), Erickson Air Crane, Inc. (heavy lift helicopter company).

> Mr. Welch has both front line and senior executive experience in our industry and is a 35-year veteran of our Company. Our Board relies on his knowledge and perspectives about our industry, operations, business and competitive environment, strategies, challenges and opportunities. Mr. Welch's leadership skills have been crucial in developing and leading our turnaround strategy, reinvigorating our corporate culture and employee morale, returning our Company to operating profitability, and building an effective leadership team.

**Defendant Pierson**

37.     Defendant Jamie G. Pierson ("Pierson") served as the Company's CFO from November 2011 to December 2016. Pierson served as a consultant for six months subsequent to

his resignation. According to the Company's Schedule 14A filed with the SEC on March 17, 2016 (the "2016 Proxy Statement"), as of March 3, 2016, Defendant Pierson beneficially owned 207,679 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 2, 2016 was $8.44, Defendant Pierson owned approximately $1.75 million worth of YRC stock.

38.     For the fiscal year ended December 31, 2016, Defendant Pierson received $1,631,797 in compensation from the Company. This included $612,000 in salary, $908,299 in stock awards, and $111,498 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Pierson received $2,674,718 in compensation from the Company. This included $612,000 in salary, $929,220 in stock awards, $1,022,040 in non-equity incentive plan compensation, and $111,458 in all other compensation. For the fiscal year ended December 31, 2014, Defendant Pierson received $6,985,251 in compensation from the Company. This included $612,000 in salary, a $83,000 bonus, $6,181,926 in stock awards, and $108,325 in all other compensation.

39.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pierson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 8/12/2016 | 49,000 | $11.28 | $552,720 |
| 8/4/2015 | 84,155 | $20.40 | $1,716,761 |
| 11/20/2014 | 10,596 | $22.47 | $238,123 |
| 3/11/2014 | 19,700 | $24.35 | $479,655 |

40.     Thus, in total, before the fraud was exposed, he sold 163,451 Company shares on inside information, for which he received almost $3 million. His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Hawkins**

41.     Defendant Darren D. Hawkins ("Hawkins") has served as the Company's CEO since April 2018. Previously, he served as the Company's President and Chief Operating Officer ("COO") from January 2018 through April 2018, as YRC Freight's President from February 2014 through December 2017, and as YRC Freight's Senior Vice President of Sales and Marketing from January 2013 through February 2014. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Hawkins beneficially owned 378,290 shares of the Company's common stock, which represented 1.1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Hawkins owned approximately $3.17 million worth of YRC stock.

42.     For the fiscal year ended December 31, 2018, Defendant Hawkins received $4,425,681 in compensation from the Company. This included $708,814 in salary, $1,412,564 in stock awards, $2,208,750 in non-equity incentive plan compensation, and $95,553 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hawkins received $820,759 in compensation from the Company. This included $521,833 in salary, $244,382 in stock awards, $27,000 for change in pension value, and $27,544 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Hawkins received $988,936 in compensation from the Company. This included $481,000 in salary, $475,924 in stock awards, $25,000 for change in pension value, and $7,012 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Hawkins received $1,492,456 in compensation from the Company. This included $460,333 in salary, $455,495 in stock awards, $573,593 in non-equity incentive plan

13

compensation, and $3,035 in all other compensation. For the fiscal year ended December 31, 2014, Defendant Hawkins received $1,292,039 in compensation from the Company. This included $426,154 in salary, $737,100 in stock awards, $41,000 for change in pension value, and $87,785 in all other compensation.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hawkins made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 2/28/2017 | 7,500 | $12.81 | $96,075 |
| 2/24/2017 | 7,500 | $12.50 | $93,750 |
| 8/2/2016 | 18,896 | $11.59 | $219,004 |
| 11/6/2015 | 5,000 | $17.48 | $87,425 |
| 8/14/2015 | 3,705 | $19.47 | $72,140 |
| 2/13/2015 | 1,571 | $19.87 | $31,215 |
| 11/21/2014 | 8,000 | $23.35 | $186,800 |
| 11/5/2014 | 2,241 | $23.56 | $52,806 |

44.     Thus, in total, before the fraud was exposed, he sold 54,413 Company shares on inside information, for which he received approximately $839,229. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Hawkins:

> Chief Executive Officer of the Company (since April 30, 2018), President and Chief Operating Officer of the Company (January 2018 – April 2018), President (February 2014 – December 2017), Senior Vice President, Sales and Marketing (January 2013 – February 2014) of YRC Freight; Director of Operations (December 2011 – January 2013) and Director of Sales (January 2009 – December 2011) for Con-Way Freight, a subsidiary of Con-Way, Inc.; various positions of increasing responsibility with Yellow Transportation, Inc. (1991 – 2009); Member of the American Transportation Research Institute Board (2018).

Mr. Hawkins has nearly 30 years of experience in the trucking industry. Our Board relies on his knowledge and perspectives about our industry, operations, business and competitive environment, employee and union matters, strategies, challenges and opportunities.

**Defendant Fisher**

46.     Defendant Stephanie D. Fisher ("Fisher") has served as the Company's CFO since May 2017, and previously served as the Company's Vice President and Controller from May 2012 through May 2017. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Fisher beneficially owned 94,913 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Fisher owned approximately $797,269 worth of YRC stock.

47.     For the fiscal year ended December 31, 2018, Defendant Fisher received $1,500,317 in compensation from the Company. This included $400,000 in salary, $141,214 in stock awards, $930,000 in non-equity incentive plan compensation, and $29,103 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Fisher received $584,902 in compensation from the Company. This included $358,285 in salary, a $43,205 bonus, $138,334 in stock awards, and $45,078 in all other compensation.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Fisher made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/7/2014 | 5,000 | $23.50 | $117,500 |

49.     Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

**Defendant Bromark**

50.     Defendant Raymond J. Bromark ("Bromark") has served as a Company director since July 2011. He also serves as Chair of the Audit & Ethics Committee. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Bromark beneficially owned 106,889 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Bromark owned approximately $897,867 worth of YRC stock.

51.     For the fiscal year ended December 31, 2018, Defendant Bromark received $251,044 in compensation from the Company. This included $130,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Bromark received $232,289 in compensation from the Company. This included $100,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Bromark received $227,859 in compensation from the Company. This included $100,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Bromark received $206,829 in compensation from the Company. This included $97,500 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Bromark received $304,597 in compensation from the Company. This included $90,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

52.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bromark made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 5/22/2018 | 5,000 | $10.79 | $53,949 |
| 5/5/2014 | 5,000 | $21.17 | $105,835 |

53.     Thus, in total, before the fraud was exposed, he sold 10,000 Company shares on inside information, for which he received approximately $159,784. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

54.     The Company's 2019 Proxy Statement stated the following about Defendant Bromark:

> Retired (since 2006); PricewaterhouseCoopers LLP (accounting and advisory services): (1967 – 2006), Head of Professional, Technical, Risk and Quality Group (2000 – 2006), Global Audit Partner (1994 – 2000), Deputy Vice Chairman, Audit and Business Advisory Services (1990 –1994), Audit Partner (1980 – 1990), and consultant (2006 – 2007); Current Director: Frontera Energy Corporation (previously Pacific Exploration & Production Corp.) (explorer and producer of natural gas and crude oil); CA, Inc. (information technology management software and services); Tesoro Logistics GP, LLC, the General Partner of Andeavor Logistics LP (previously Tesoro Logistics LP) (operator, developer and acquirer of crude oil, refined products and natural gas logistics assets).

> Mr. Bromark draws on his extensive experience in accounting, auditing, financial reporting and compliance, and regulatory affairs; deep understanding of financial controls and familiarity with large public company audit clients; experience in leadership positions at PricewaterhouseCoopers LLP; and experience as a current or former director, including audit committee chairman, of other public companies to provide important guidance to our Board on financial reporting and accounting issues affecting our Company.

**Defendant Carty**

55.     Defendant Douglas A. Carty ("Carty") has served as a Company director since July 2011. He also serves as a member of the Audit & Ethics Committee, the Compensation Committee, and the Finance Committee. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Carty beneficially owned 106,889 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Carty owned approximately $897,867 worth of YRC stock.

56.    For the fiscal year ended December 31, 2018, Defendant Carty received $226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Carty received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Carty received $202,859 in compensation from the Company. This included $75,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Carty received $184,329 in compensation from the Company. This included $75,500 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Carty received $289,597 in compensation from the Company. This included $75,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

57.    The Company's 2019 Proxy Statement stated the following about Defendant Carty:

Switzer-Carty Transportation Inc. (transportation): Chairman (since 2011); First Group America (transportation): Commercial Director, North America (2007 – 2008); Laidlaw Education Services (school bus transportation): President and Chief Executive Officer (2006 – 2007), Executive Vice President and Chief Financial Officer, Laidlaw International Ltd. (2003 – 2006); Atlas Worldwide Holdings, Inc. (global air freight): Senior Vice President and Chief Financial Officer (2001 – 2003); Canadian Airlines Corp. (commercial airline): Senior Vice President and Chief Financial Officer (1996 – 2000); Current Director: Wajax Industries Ltd. (sales, parts and service of mobile equipment, industrial components and power systems); and Points International Ltd. (internet-based loyalty reward program management platform).

Mr. Carty has senior executive experience in the transportation industry, experience with financial restructurings, and experience on other corporate boards. This

expertise informs his advice to our Board on the financial and operational issues we face.

### **Defendant Davidson**

58.     Defendant William R. Davidson ("Davidson") has served as a Company director since July 2014. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Davidson beneficially owned 65,435 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Davidson owned approximately $549,654 worth of YRC stock.

59.     For the fiscal year ended December 31, 2018, Defendant Davidson received $196,044 in compensation from the Company. This included $75,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Davidson received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Davidson received $202,859 in compensation from the Company. This included $75,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Davidson received $184,329 in compensation from the Company. This included $75,500 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Davidson received $195,521 in compensation from the Company. This included $56,250 in retainer fees received in cash, $138,816 in an annual reward of restricted stock units, and $185 in all other compensation.

60.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Davidson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/7/2017 | 3,921 | $13.40 | $52,533 |
| 2/21/2017 | 3,800 | $13.11 | $49,818 |

61.     Thus, in total, before the fraud was exposed, he sold 7,721 Company shares on inside information, for which he received approximately $102,351. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

62.     The Company's 2019 Proxy Statement stated the following about Defendant Davidson:

> Trucking Management, Inc. (multi-employer bargaining arm of the unionized general freight trucking industry): Senior Director (since 2013); Virginia Health & Welfare and Pension Funds: Employer Chairman (since 2005); Western States Health & Welfare Trust Funds: Trustee (since 2002); Retired, though acting consultant in the trucking industry (2009 – 2013); Roadway Express, Inc. (motor freight carrier company): Corporate Vice President (2003 – 2009), Area Vice President of Labor Relations, Southern Division (1994 – 2003), Western Division (1985 – 1994).

> Mr. Davidson draws on his experience and knowledge of the trucking business with over 40 years in the industry. These inform his expertise in operational, union and labor relations matters.

**Defendant Doheny**

63.     Defendant Matthew A. Doheny ("Doheny") has served as a Company director since July 2011. He also serves as Chair of the Finance Committee and as a member of the Compensation Committee. According to the 2010 Proxy Statement, as of April 11, 2019, Defendant Doheny beneficially owned 106,889 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Doheny owned approximately $897,867 worth of YRC stock.

64.     For the fiscal year ended December 31, 2018, Defendant Doheny received $271,044 in compensation from the Company. This included $150,000 in fees earned or cash paid,

$120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Doheny received $222,289 in compensation from the Company. This included $90,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Doheny received $217,859 in compensation from the Company. This included $90,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Doheny received $198,079 in compensation from the Company. This included $88,750 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Doheny received $299,597 in compensation from the Company. This included $85,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

65.     The Company's 2019 Proxy Statement stated the following about Defendant Doheny:

> North Country Capital LLC (private investment firm): Founder and President (since 2011); HSBC Securities (USA), Inc.: Managing Director, Co-head of U.S. Special Situations Trading (2016-2017); Fintech Advisory Inc. (private investment firm): Portfolio Manager (2008 –2010); U.S. House of Representatives Candidate (2010 and 2012); Deutsche Bank Securities Inc. (investment bank): Managing Director, Distressed Assets Group (2000 – 2008); Kelley Drye & Warren LLP and Orrick, Herrington & Sutcliffe LLP: Bankruptcy Attorney (1995-2000); Current Director: Arcapita Inc. (private equity firm) (previously R.A. Holdings Corp.), Eastman Kodak Inc. (printing technology); Former Director: Affinity Gaming (casino operator), BridgeStreet Worldwide, Inc. (corporate housing provider).

> Mr. Doheny's financial expertise and experience as an investor in financial and operational turnarounds are a source of valuable insight to our Board on our financial structure and turnaround strategy.

### Defendant Friedman

66.     Defendant Robert L. Friedman ("Friedman") has served as a Company director since July 2011. He also serves as a member of the Finance Committee and as a member of the

Audit & Ethics Committee. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Friedman beneficially owned 106,889 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Friedman owned approximately $897,867 worth of YRC stock.

67.     For the fiscal year ended December 31, 2018, Defendant Friedman received $226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Friedman received $207,289 in compensation from the Company. This included $75,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Friedman received $202,859 in compensation from the Company. This included $75,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Friedman received $184,329 in compensation from the Company. This included $75,500 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Friedman received $289,597 in compensation from the Company. This included $75,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

68.     The Company's 2019 Proxy Statement stated the following about Defendant Friedman:

> The Blackstone Group LP (investment and financial advisory firm): Senior Advisor (since 2012), Senior Managing Director (1999 – 2012), Chief Legal Officer (2003 – 2010) and Chief Administrative Officer (2003 –2007); Simpson Thacher & Bartlett (legal services): Partner (1975 – 1999); Current Director: Axis Capital Holdings Ltd. (insurance and reinsurance) and Harrington Reinsurance Holdings Limited (chairman of the board) (reinsurance); Former Director: Orbitz Worldwide, Inc. (travel products and services), TRW Automotive Holdings Inc. (automobile systems, components and modules), Corp Group Banking S.A. (banking), FGIC

Corporation (insurance), Northwest Airlines, Inc. (airline), The India Fund, Inc. (closed end mutual fund), American Axle & Manufacturing, Inc. (automotive components), and Premcor Inc. (oil refining).

Mr. Friedman has a unique combination of experience as a corporate lawyer and outside counsel to public companies and their boards on corporate governance and other legal matters, experience in financial and investment analysis as a senior officer of a leading investment firm, and experience as a current or former director of other public companies. Mr. Friedman draws on this experience to provide valuable guidance to our Board on our corporate governance, financial management, and legal and regulatory affairs.

**Defendant Hoffman**

69.     Defendant James E. Hoffman ("Hoffman") has served as a Company director since July 2011. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Hoffman beneficially owned 106,889 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Hoffman owned approximately $897,867 worth of YRC stock.

70.     For the fiscal year ended December 31, 2018, Defendant Hoffman received $306,044 in compensation from the Company. This included $185,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hoffman received $257,289 in compensation from the Company. This included $125,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Hoffman received $252,859 in compensation from the Company. This included $125,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Hoffman received $234,329 in compensation from the Company. This included $125,000 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Hoffman received $339,597 in compensation from the Company. This included $125,000 in retainer fees received in cash,

$107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted

stock units, and $185 in all other compensation.

71.     The Company's 2019 Proxy Statement stated the following about Defendant

Hoffman:

> Retired (since 2015); 2001 Development Corporation (commercial office property
> development and redevelopment services): Executive Manager (2008 – 2015);
> Alliant Energy Business Development: Executive Vice President; Alliant Energy
> Resources, a subsidiary of Alliant Energy Corporation (electric and natural gas
> services): President (1998 – 2005); IES Industries Inc. (predecessor to Alliant
> Energy Corporation): Executive Vice President (1996 – 1998); IES Utilities Inc.:
> Executive Vice President (1995 – 1996); MCI Communications: Chief Information
> Officer (1993 – 1995) and Senior Vice President (1990 – 1993); Telecom USA
> (telecommunications): Executive Vice President (1988 – 1990). Mr. Hoffman is
> also a past chairman of the board of the Iowa Health System, the largest health care
> provider in the state of Iowa.

> Mr. Hoffman's executive leadership and restructuring and other board experience
> inform his counsel to the Board on the financial and operational issues we face and
> contribute to his effectiveness as our Board Chairman.

### Defendant Kneeland

72.     Defendant Michael J. Kneeland ("Kneeland") served as a Company director from

July 2011 until he stepped down on June 5, 2019. He also served as a member of the Compensation

Committee and the Governance Committee. According to the 2019 Proxy Statement, as of April

11, 2019, Defendant Kneeland beneficially owned 106,889 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on

April 11, 2019 was $8.40, Defendant Kneeland owned approximately $897,867 worth of YRC

stock.

73.     For the fiscal year ended December 31, 2018, Defendant Kneeland received

$226,044 in compensation from the Company. This included $105,000 in fees earned or cash paid,

$120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December

31, 2017, Defendant Kneeland received $211,039 in compensation from the Company. This included $78,750 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Kneeland received $217,859 in compensation from the Company. This included $90,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Kneeland received $198,079 in compensation from the Company. This included $88,750 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Kneeland received $299,597 in compensation from the Company. This included $85,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

74.    The Company's 2019 Proxy Statement stated the following about Defendant Kneeland:

> United Rentals, Inc. (equipment rental): President and Chief Executive Officer (since 2008), Interim Chief Executive Officer (2007 – 2008), Executive Vice President and Chief Operating Officer (2007), Executive Vice President – Operations (2003 – 2007), Regional Vice President (2000 – 2004), and District Manager (1998 – 2000); Current Director: United Rentals, Inc. (equipment rental) and Anticimex (private Swedish pest control company).

> Mr. Kneeland is experienced in a number of substantive areas affecting our Company, including logistics, information technology, real estate, risk management, human resources and public company oversight and governance, from his tenure at a large, publicly-held corporation. Mr. Kneeland draws on this experience to provide our Board with valuable perspectives on the operational and strategic issues we face.

**Defendant Nazemetz**

75.    Defendant Patricia M. Nazemetz ("Nazemetz") has served as a Company director since March 2015. She also serves as Chair of the Compensation Committee and as a member of the Governance Committee. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Nazemetz beneficially owned 68,351 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Nazemetz owned approximately $574,148 worth of YRC stock.

76.     For the fiscal year ended December 31, 2018, Defendant Nazemetz received $241,044 in compensation from the Company. This included $120,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Nazemetz received $218,539 in compensation from the Company. This included $86,250 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Nazemetz received $202,859 in compensation from the Company. This included $75,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Nazemetz received $165,579 in compensation from the Company. This included $56,250 in fees earned or cash paid and $109,329 in stock awards.

77.     The Company's 2019 Proxy Statement stated the following about Defendant Nazemetz:

> NAZ DEC LLC (executive consulting firm): Principal and founder (since 2011); Xerox Corporation (document technology, services, software and supplies): Corporate Vice President and Chief Human Resources and Ethics Officer (2007 – 2011), Chief Human Resources Officer (1999 – 2007), other key roles in the human resources department (1979 – 1999); Current Director: Sterling Bancorp (bank holding company for Sterling National Bank); Former Director: Astoria Financial Corporation (holding company for Astoria Bank) (2013 – 2017); WMS Industries, Inc. (casino gaming machines manufacturer) (2007 – 2013); Energy East Corporation (electricity and natural gas distributor) (2007 – 2008).

> Ms. Nazemetz's notable career in all areas of human resources management, including succession planning, executive compensation, employee benefits and other areas, bring valuable skills and insight to the Board. Further, Ms. Nazemetz has extensive experience with public company boards as well as serving on numerous non-profit boards throughout her career.

**Defendant Winestock**

78.     Defendant James F. Winestock ("Winestock") has served as a Company director since July 2011. He also serves as Chair of the Governance Committee. According to the 2019 Proxy Statement, as of April 11, 2019, Defendant Winestock beneficially owned 111,899 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 11, 2019 was $8.40, Defendant Winestock owned approximately $939,951 worth of YRC stock.

79.     For the fiscal year ended December 31, 2018, Defendant Winestock received $236,044 in compensation from the Company. This included $115,000 in fees earned or cash paid, $120,557 in stock awards, and $487 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Winestock received $217,289 in compensation from the Company. This included $85,000 in fees earned or cash paid and $132,289 in stock awards. For the fiscal year ended December 31, 2016, Defendant Winestock received $212,859 in compensation from the Company. This included $85,000 in fees earned or cash paid and $127,859 in stock awards. For the fiscal year ended December 31, 2015, Defendant Winestock received $194,329 in compensation from the Company. This included $85,500 in fees earned or cash paid and $109,329 in stock awards. For the fiscal year ended December 31, 2014, Defendant Winestock received $299,597 in compensation from the Company. This included $85,000 in retainer fees received in cash, $107,776 in an annual reward of restricted stock units, $106,636 in a special award of restricted stock units, and $185 in all other compensation.

80.     The Company's 2019 Proxy Statement stated the following about Defendant Winestock:

> Retired (since 2009); United Parcel Service, Inc. (package delivery and freight transportation): Senior Vice President for U.S. Operations and Global Security

(2004 –2009), President and Chief Operating Officer, North Central Region (2000 – 2004), President and Chief Operating Officer, Midwest Region (1998 – 2000), and various other positions (1969 – 1998); Current Director: FirstGroup plc (train and bus transportation); Former Manager: AMP Americas (CNG developers).

Mr. Winestock draws on his knowledge of the transportation industry, gained from over 40 years of leadership experience at United Parcel Service, Inc., to provide our Board with valuable perspectives on the opportunities and challenges facing our industry and our operational, management and strategic issues.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

81.     By reason of their positions as officers, directors, and/or fiduciaries of YRC and because of their ability to control the business and corporate affairs of YRC, the Individual Defendants owed YRC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage YRC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of YRC and its shareholders so as to benefit all shareholders equally.

82.     Each director and officer of the Company owes to YRC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

83.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of YRC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

84.     To discharge their duties, the officers and directors of YRC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

85.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of YRC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised YRC's Board at all relevant times.

86.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

87.     To discharge their duties, the officers and directors of YRC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of YRC were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to YRC's own Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how YRC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of YRC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that YRC's operations would comply with all applicable laws and YRC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

88.     Each of the Individual Defendants further owed to YRC and the shareholders the duty of loyalty requiring that each favor YRC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

89.     At all times relevant hereto, the Individual Defendants were the agents of each other and of YRC and were at all times acting within the course and scope of such agency.

90.     Because of their advisory, executive, managerial, and directorial positions with YRC, each of the Individual Defendants had access to adverse, non-public information about the Company.

91.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by YRC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

92.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

93.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

94.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of YRC, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

95.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

96.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of YRC and was at all times acting within the course and scope of such agency.

## YRC'S CODE OF CONDUCT

97.     The Company's Code of Business Conduct (the "Code of Conduct") states that it is "the core of our corporate legal compliance program and applies to all of us, including our directors, officers, employees, representatives, agents, contractors, consultants, joint ventures, and anyone acting on our behalf."

98.     The Code of Conduct "supports and articulates" YRC's "core values and []
commitment to personal responsibility and a values-driven culture" which are "integral to [YRC's]
business conduct. . ." The Code of Conduct outlines YRC's core values, which include:

- Exceed customer expectations
- Value our people
- Work safely
- Demonstrate good citizenship
- Act with integrity
- Embrace teamwork

99.     The Code of Conduct outlines the seriousness of violating it, stating in relevant
part: "[c]ompliance with this Code is both important and required. We take this seriously. We will
not authorize, tolerate or participate in any business practice that violates this Code or the laws or
regulations that apply to us."

100.    The Code of Conduct provides, as to "Keeping Accurate Records," that:

We rely on our financial records to produce reports to the Board, management,
stakeholders, lenders, government agencies and the public. These records must
accurately reflect our assets, liabilities, financial condition and performance.

We must provide accurate and truthful information in all reports and records,
including timekeeping records, trip logs, expense reports, business records,
financial statements, and reports to lenders. If you are part of our Finance or
Accounting organization, you have a special duty to ensure that our financial
disclosures are full, fair, accurate, timely and understandable.

* * *

All transactions must be recorded with care and honesty, and be supported by
adequate documentation to permit review and audit.

If you are unsure how to properly record a transaction, you should contact your
supervisor.

Each person at the Company – not just those in Finance – has a role in making sure
that money is appropriately spent, our financial records are complete and accurate
and internal controls are honored. To make sure that we get this right, the Company
maintains a system of internal controls to reinforce our compliance with legal,
accounting, tax and other regulatory requirements at every location in which we

operate. Stay in full compliance with our system of internal controls, and don't hesitate to contact our Legal Department or Finance if you have any questions.

We must never be involved in:

- Submitting false invoices or expense reports
- Forging or altering checks or misdirecting payments
- Unauthorized handling, or false or misleading reporting, of transactions
- Creating or manipulating financial information so as to artificially inflate, depress, distort or conceal financial results
- Intentionally misclassifying transactions between accounts, departments or accounting periods
- Failing to record transactions in the proper account or accounting period
- Keeping secret or special books, records or accounts
- Improperly overriding or working around our system of internal controls
- Improper or fraudulent interference with, coercion, manipulation or misleading of, internal or external auditors or the Audit & Ethics Committee

101.    The Code of Conduct provides, as to "Transparency and Full Disclosure," that:

Transparency and full disclosure of our financial condition, operating results and significant risks and events are critical to our integrity and required by law. They depend upon the validity, accuracy and completeness of the information upon which our accounts, records and financial statements are based and the effectiveness of our internal accounting and disclosure controls. If you are involved in preparing, processing or recording such information, you must take responsibility for its accuracy and integrity. Our public communications, including filings with the SEC and communications with stakeholders, lenders and analysts, must be fair, accurate, timely, complete and understandable. If you are involved in our SEC reporting process, and especially if you are a senior officer in Finance or Accounting or a person with supervisory responsibilities for our public disclosure documents, you must act in furtherance of this requirement. In particular, you are required to be familiar and comply with all SEC disclosure rules and guidance and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about us, or knowingly making any misleading statements, in our public disclosures or otherwise. If you have any of these responsibilities, you must strictly comply with all internal controls and procedures for preparing public disclosures. Finance and Accounting employees must record, classify and summarize all transactions in accordance with our internal control procedures, GAAP, and applicable securities laws and regulations. We must never create, or encourage others to create, records that are intended to mislead others or conceal improper activity or adverse results.

102.    The Code of Conduct provides, as to "Insider Trading," that:

Trading in our securities (common stock or public notes), or the securities of our publicly-traded Customers, suppliers, Business Partners or Transaction Parties, while in possession of material, nonpublic information about them or us, or disclosing that information to others for trading purposes, is against the law and a violation of this Code. See our Securities Trading and Disclosure Policy for a definition of material, nonpublic information and the laws and policies governing trading in our and others' securities. Any person failing to comply with our Securities Trading and Disclosure Policy or insider trading laws will be subject to disciplinary action, including termination of employment or other business relationship, and can also be subject to civil and criminal liability.

103.   The Code of Conduct provides, as to the Company's compliance with its contracts, that: "[i]f your work involves the performance of any Company contract, you must carefully avoid any acts or omissions that could cause us to breach the contract. This means you should be familiar with the contractual provisions applicable to your work. When in doubt, you should obtain guidance from your supervisor."

104.   The Code of Conduct provides, as to the Company's dealings with government agencies, that: "[i]f your work involves government agencies or officials, you must be aware of, and comply with, unique laws and regulations governing your actions. Conduct that is acceptable in the private sector may result in harsh consequences such as fines, penalties, debarment, suspension from competing for government contracts, and even criminal penalties."

105.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes to engage in the Reweighing Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of the Company's records, reports, and other public disclosures, comply with laws and regulations,

uphold contractual obligations with customers and the government, and properly report violations of the Code of Conduct. Moreover, certain of the Individual Defendants engaged in insider sales in violation of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

106.    YRC is a holding company that, through its operating subsidiaries, offers its customers a wide range of transportation services. The Company also offers expertise in heavyweight shipments and flexible supply chain solutions to help its customers ship industrial, commercial, and retail goods.

107.    The Company's reporting segments include YRC Freight, which focuses on longer haul business opportunities with national, regional, and international services, and Regional Transportation, which focuses on business opportunities in the regional and next-day delivery markets and is comprised of USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway.

108.    YRC Freight was the resulting entity of a March 2009 merger between Yellow Transportation and Roadway Express. Prior to the merger, Yellow purchased Roadway in 2003 for approximately $966 million in cash and stock. From 2003 onwards, the two companies operated as individual entities but shared certain corporate functions regarding "best practices." The two companies merged into YRC, Inc. in 2009 and operated as YRC Freight from at least February 2012.

109.    YRC Freight provides most of the Company's revenue, and accounted for 63%-64% of YRC's overall consolidated operating revenue throughout the Relevant Period. The Company reports its revenue primarily through weights per shipment and yield, i.e. revenue per shipment.

110.     YRC derives a significant portion of its business from the U.S. government, particularly from government agencies such as the DOD. The Company's website states that YRC "provides dedicated personnel who work exclusively to create and manage transportation and logistics solutions that meet the needs of departments and agencies in the U.S. government." YRC has a dedicated Government Solutions team "of experienced transportation professionals [who work] exclusively with the U.S. government to deliver confidence with transportation and logistics services which meet your missions' needs."

**The Reweighing Misconduct**

111.     From September 2005 through at least October 2013, the Individual Defendants caused YRC Freight, Roadway Express, and Yellow Transportation to engage in a fraudulent scheme to use inflated cargo weights to deliberately overcharge its customers, including the DOD, for freight services.

112.     Generally, YRC Freight, Roadway Express, and Yellow Transportation, like other freight carriers collected each shipment from their respective locations and eventually transferred the shipment onto another vehicle in order to ship it to its ultimate destination. Each shipment contained a bill of lading, which represented the customer's and carrier's mutual understanding of information regarding the actual shipment, such as the shipment's weight, time required for delivery, and the shipment's destination. The bill of lading included the carrier's acknowledgment of receipt of the shipment and included terms of delivery, and it was ultimately used to invoice the customer. The cost of each shipment was determined by the weight and distance associated with that shipment. Between picking up the shipment at its initial location and transferring the shipment to the vehicle that would deliver it to its final location, the shipment and bill of lading would be verified at the freight carrier's terminal or warehouse. This process often involved reweighing the

37

shipment. The shipment's weight, as confirmed by a YRC Freight executive in an internal email, "drives the price [the Company] charge[d] and invoice[d] the customer."[3]

113.    During this period, Roadway Express and Yellow Transportation, as part of an effort to increase their revenue, would check the weight of each load of cargo that passed through their respective freight terminals. As noted above, these companies' revenue depended in large part on the weight of shipments, and higher weight usually meant more revenue. If Roadway Express and Yellow Transportation performed a "positive reweigh correction," and the weight verification, or "reweigh," showed that a shipment was heavier than the stated weight, the companies would typically receive more revenue as a result after correcting the weight.

114.    By the same token, a "negative reweigh correction," following a reweigh showing that the shipment was lighter than stated, had previously typically resulted in a reduction in the price of the shipment after correction and thus reduce the companies' revenue.

115.    Prior to September 2005, YRC Freight, Yellow Transportation, and Roadway Express utilized the reweigh-verification process for both "positive" and "negative" reweighs. Indeed, the accuracy of each carriers' shipment weights implicated their integrity.

116.    According to an internal Yellow Transportation email in October 2004 concerning the potential false weight increases of shipments at one of its terminals during the reweigh process, resulting overcharges "creates an integrity problem from Yellow with every affected customer."

117.    Another internal email from May 2005 reflected that Yellow Transportation actually excluded negative reweigh corrections in internal tracking reports to avoid "discourag[ing] anyone from doing the 'right thing' by [making] a negative revenue correction."

---

[3] Facts alleged in this amended complaint regarding the Company's internal emails and other communications pertaining to the Reweighing Misconduct are, unless otherwise specified herein, based on the allegations in the pleadings and other filings in the DOD Action.

118.    Likewise, an internal email from Roadway Express in June 2005 reflected that it was initially "opposed to using net numbers" when analyzing how reweigh corrections affected shipment revenue "as it sends the wrong message to those responsible for [making] correction— IE don't [make] corrections in favor of the customer." On August 22, 2005, Roadway Express integrated new scales and tracking devices into its shipment operations as part of an effort to streamline Roadway Express' reweigh procedures. In connection with the streamlining efforts, Roadway Express managers were informed that the upgrades to their weighing systems would allow Roadway Express to "capture all positive and negative weight corrections regardless of the weight difference." The managers were also instructed that the "integrity of correction information is critical in providing the customer with an accurate invoice and supporting documentation."

119.    Overall, the streamlined reweighing procedures resulted in more positive reweigh corrections than negative corrections, leading to a "50% increase in revenue" for Roadway Express.

120.    On September 1, 2005, Keith Rawson ("Rawson"), then Senior Director for Revenue Management for Yellow Roadway Enterprise Services, which was overseeing the Roadway Express-Yellow Transportation merger, reported in an internal email that Roadway Express had started "analyzing limits on negative reweighs," and had concluded that eliminating negative reweigh corrections was an "opportunity" that would collectively generate an additional $2 million per month for Roadway Express and Yellow Transportation. Upon information and belief, Rawson also served as YRC Freight's Director of Safety from January 2007 through October 2009, Roadway Enterprise's Director of Quality Administration and Safety between April 2006 and January 2007, and he continued at the Company following the merger as a Director of Procurement and Accounts Payable from April 2013 to December 2016.

121.   On or around September 13, 2005, Roadway Express largely ceased making negative reweigh corrections, yet continued making positive reweigh corrections, i.e., correcting weights only if the reweigh showed that the customers could be charged more. When negative reweighs showed that customers should receive a credit or discounts, Roadway Express would not correct the weight.

122.   On September 19, 2005, Rawson noted that "Roadway had basically done this on [its] own," but he and executives at Yellow Transportation could take credit if "we consider [eliminating negative reweigh corrections] a best practice and implement [it] at Yellow."

123.   On September 26, 2005, Joe Whitsel ("Whitsel"), Vice President for Revenue Management at Yellow Roadway Enterprise Services, stated to Rawson via email that "[w]e need to make [eliminating negative reweigh corrections] happen – I need the numbers to make [our] synergy goal for the year." Rawson responded to Whitsel via email on September 29, 2005, stating that eliminating negative reweigh corrections would cause Yellow Transportation to "retain approximately $6 million per year." This information was forwarded to Todd Hacker ("Hacker"), the Senior Vice President for Finance & Administration at Yellow Transportation, who stated that the information in Rawson's email would be discussed with Defendant Welch, Yellow Transportation's CEO and President at the time. Upon information and belief, Whitsel served as YRC's Vice President Cash Management/Finance Shared Services between January 2010 and January 2017 at the Company's headquarters, and previously served as Vice President Revenue Management/Vice President Business Integration between September 1999 and January 2010, and Hacker served in various leadership positions at YRC, including as VP Investor Relations and Treasurer between February 2007 and December 2007.

124. On October 3, 2005, Dean Frye ("Frye"), a senior manager at Roadway Express, sent a widely distributed internal email noting the implementation of a policy change which "eliminate[d] the automated issuance of negative weight corrections," and that, with a few exceptions, "[n]egative weight corrections will no longer be [made]."

125. Also on October 3, 2005, Whitsel informed Mike Smid ("Smid"), the President and CEO of Roadway Express that "we are recommending that Yellow follow Roadway's lead and implement the elimination of the negative revenue adjustments." Smid expressed uncertainty about implementing a total elimination of negative reweigh corrections, stating that there was "a right number in order to give our [reweigh] program some credibility." Upon information and belief, Smid served as the CEO and President of YRC National Transportation—now known as YRC Freight, between 2007 and 2009, as Chief Operations Officer between 2009 and July 2011 at the Company's headquarters, and held other positions at Yellow Transportation between 1985 and 2004, and purportedly identified more than $350 million per year in potential "synergies" that could result from the merger between Roadway Express and Yellow Transportation. In response to Smid's concerns, Rawson identified different scenarios that could trigger partial disclosures to customers and reported his conclusions to Whitsel in an email that maintained that in order to reduce negative reweigh corrections by 50%, the Company could "only process a weight correction if the weight changes by more than 70%." Rawson additionally mentioned that the Company could instead set a dollar threshold of $800, whereby if a shipment's weight reduced revenue by $799 or less, the Company would not credit or disclose the discrepancy to the customer.

126. At an industry meeting on or about October 24, 2005, Hugh Gaynor ("Gaynor"), a Revenue Management executive at Yellow Transportation, discussed negative reweigh correction policies with other freight company executives. Subsequently, Gaynor reported that almost all of

the freight companies he received input from "believed that [not making negative reweigh corrections] was a breach of faith with their consumers and undermined the integrity of the program."

127.    After contemplating different possibilities, Rawson recommended, "if we are going to do it, let's go all the way." Rawson reasoned that it would be "just as difficult to explain the difference in the positive and negative tolerance vs. saying we don't have one," and that if a customer found out that the Company did not make negative reweigh corrections, then "[the Company is] probably going to end up waiving [the extra cost] anyway[,]" i.e. when a customer became privy to YRC Freight's reweigh practices, the carriers would probably need to implement negative reweigh corrections as to that customer to avoid losing business.

128.    On October 27, 2005, Rawson provided these recommendations to Whitsel, and stated to Whitsel that YRC Freight "could see $10–20 million in annualized revenue from a best practice weight correction program." Rawson also noted that Roadway Express was generating an additional $1.5 million per month in revenue as a result of eliminating negative reweigh corrections, and that Yellow Transportation could generate an additional $500,000 in "revenue retained per month," by implementing similar practices.

129.    The next month, on November 2, 2005, Whitsel informed another Yellow Roadway Enterprise Services executive that, in addition to Roadway Express, two other freight companies were not "entering negative weight corrections."

130.    On January 5, 2006, Rawson and Whitsel submitted a formal work request ordering Yellow Transportation to "eliminate the negative reweigh adjustments" in order to "add [about] $500,000 per month to top and bottom line (revenue and profit)."

131.   Ultimately, Yellow Transportation followed suit on or around February 27, 2006, and ceased making negative reweigh corrections under the direction and authorization of Defendant Welch and other executives at Yellow Transportation.

132.   In a March 1, 2006 email responding to questions from Yellow Transportation employees, Gaynor stated that Roadway Express had not been making negative reweigh corrections for six months, and that "Yellow Senior Management [including Defendant Welch] has decided to follow suit and not process negative adjustments." Gaynor, moreover, noted that "[t]his information is for your use only and should not be communicated outside of our team."

133.   Yellow Transportation, like Roadway Express, saw immediate results after implementing its new reweigh policy, as evidenced by an internal presentation from June 15, 2006 reflecting that Yellow Transportation had achieved great success decreasing or eliminating "the number of [reweigh corrections] that result in a negative reweigh change."

134.   In an internal email sent on January 4, 2007, Gaynor stated that "[Yellow Transportation] need[s] to actively promote the reweigh program." On January 16, 2007, Gaynor sent another email instructing Yellow Transportation employees to "push the weight revenue and number of reweighs as well … do not forget to push the reweighs." In the same email, Gaynor stated that Yellow Transportation's revenue figures were "horrible."

135.   On January 23, 2007, one of Whitsel's colleagues informed Whitsel that Yellow Transportation was making "very few" negative reweigh corrections.

136.   Specifically, according to the DOD Action, between November 13, 2006 and January 20, 2007, Yellow Transportation made 75,324 positive reweigh corrections and only 42 negative reweigh corrections, out of over 1.5 million invoices. *See* Exhibit B at 18.

137.    In September 2007, Gaynor conducted a second informal industry survey with freight company executives on the subject of reweigh policies. In stark contrast to YRC Freight, each of the 12 freight companies Gaynor received input from disclosed that they did make negative reweigh corrections. Nevertheless, YRC Freight, Yellow Transportation, and Roadway Express proceeded to surreptitiously implement reweigh corrections only when it benefited them, not the customers.

138.    According to an internal email dated November 20, 2007, as a result of Yellow Transportation's $2 million investment in new scales that year, certain company terminals showed "a significant improvement in reweigh revenue" compared to November 2006. Still, there were also terminals that were "flat or even show[ing] decreases in reweigh revenue." Because Yellow Transportation found this "completely unacceptable," as the company aspired to "realize the expected revenue increase" following its investment in new scales, Yellow Transportation instructed its managers to "actively monitor the reweigh activity at their terminals" and to "hold their teams responsible for weighing freight and using the equipment provided to ensure we are properly compensated for every shipment we haul."

139.    On November 21, 2007, Gaynor forwarded the November 20, 2007 email to other employees throughout Yellow Transportation and instructed those employees "not to discuss it with anyone outside our team." Gaynor also instructed managers to "[d]o whatever you can to shine a spotlight on the reweigh results in your terminal."

140.    In spite of Roadway Express's, Yellow Transportation's, and YRC's purported concerns about credibility and integrity, the Individual Defendants continued their scheme, knowing full well that such practices were illegal and appropriately avoided by other companies in the industry.

**The DOD Action**

141.    As a result of the Reweighing Misconduct, from at least September 2005 through October 2013, Roadway Express, Yellow Transportation, and YRC Freight knowingly overcharged their customers, including the DOD, and submitted thousands of false claims to the DOD that used inflated weights to overcharge the government. *See* Exhibit C.[4] The invoices submitted to the DOD falsely represented shipment weights to be higher than the actual weights measured and led to inflated charges.

142.    When soliciting business from the DOD, the management of Roadway Express and Yellow Transportation falsely promised that they would comply with applicable rules and that they would, in some instances, correct discrepancies in billed weights revealed through a reweigh. Such false promises were made in the tenders for freight services submitted by the two companies to the DOD. These tenders were governed by the Freight Traffic Unified Rules Publication (the "MFTRP"), a rules book issued and periodically updated by the Military Surface Deployment and Distribution Command (the "SDDC").

143.    The SDDC oversees transportation needs for various branches of the DOD, and it establishes common standards for tenders of service for freight business by way of the MFTRP. When submitting tenders of service to the SDDC, if a freight carrier does not cite the MFTRP as the only set of rules governing the transaction, the SDDC may designate the tender as improper. The MFTRP also requires freight carriers to have proof of delivery, such as a bill of lading, with each of their shipments.

---

[4] Attached hereto as Exhibit C is a list of 200 samples of over 13,000 false claims billed to the DOD by YRC Freight, Yellow Transportation, and Roadway Express between 2010 and 2012.

144.   The January 4, 2004 MFTRP issued by the SDDC stated that if "a carrier independently performs a shipment weight verification and discovers a discrepancy between the verified weight and the weight shown on the [bill of lading], it is the carrier's responsibility to obtain a [bill of lading] correction notice from the origin [transportation office]."

145.   The January 4, 2004 MFTRP remained in effect until March 1, 2009, when it was replaced by an updated MFTRP, which stated that a freight carrier must provide the DOD with notice and weight tickets if a "revised shipping weight varie[d] by more than 10 percent of the estimate of the shipping activity." The MFTRP as of March 1, 2009 also required freight carriers to adhere to the "common law implied covenant of acting in good faith and fair dealing."

146.   The MFTRP was again revised on July 31, 2013. The revised rules as of that date stated that if a weight discrepancy "caused an increase or decrease to the total shipment cost from the original [bill of lading]," the freight carrier must request a correction notice from the DOD. This MFTRP repeated the statements made in the previous MFTRP iteration requiring freight carriers to adhere to common law standards of "good faith and fair dealing."

147.   Moreover, contracts entered into in 2006 between the DOD and Yellow Transportation and Roadway Express required the two companies "to immediately notify the Contracting Officer and request instructions for disposition of the overpayment" upon learning of DOD overpayment on an invoice. These contracts also authorized Roadway Express and Yellow Transportation to "reweigh a shipment at any time prior to delivery" and stated that if the weight of any reweighed shipment varied by more than 10% from its original weight, Roadway Express and Yellow Transportation "must notify [the DOD] by the next business day of the new weight."

148.   Instead of complying with the MFTRP and their contracts with the DOD, Roadway Express and Yellow Transportation, by way of the inflated charges made on the invoices they

provided to the DOD, submitted approximately 70,000 false claims to the DOD between September 2005 and October 2013, knowingly concealing and avoiding their obligations to return payment. Roadway Express and Yellow Transportation made certain that the DOD and its other customers would unknowingly overpay for shipments by not making negative reweigh corrections despite knowing that the corrections were warranted.[5]

149.    In November 2008, the DOD Action was initially filed as a qui tam lawsuit under seal by Hannum, a supervisor at Roadway Express' Tonawanda, New York facility, on behalf of himself and the U.S.

150.    In the DOD Action, Hannum alleged that he has personal knowledge of the Reweighing Misconduct, and the procedures the Individual Defendants had put into place and/or maintained, as described herein, in order to enable the Reweighing Misconduct. *See* Exhibit A. Hannum worked for years as a Weights and Inspection ("W&I") supervisor at Roadway Express, and subsequently at YRC Freight. Hannum currently works as a supervisor at one of the Company's freight terminals, where freight is scaled and weighed.

151.    Specifically, Hannum alleged that the Company consistently charged its customers, including the DOD, the General Services Administration, and other government entities, for shipments that the Company knew weighed less than the weights for which the Company charged its customers. *See id.* at 2.

152.    For example, Hannum described government shipments from Dover Air Force Base and Travis Air Force Base that were handled by Roadway Express. *See id.* at 8. Hannum alleged that after weighing these shipments, Roadway Express determined that the shipments

---

[5] Attached hereto as Exhibits D, E and F are lists of tenders submitted to the SDDC between 2005 and 2014 by Roadway Express, Yellow Transportation, and YRC, respectively.

weighed less than the stated weights on the shipments' bills of lading. *See id.* Yet, Roadway Express charged the government for the higher weights that were stated on the bills of lading despite knowing that the shipments, in fact, weighed less. *See id.*

153.    The DOD Action further alleges that the DOD overpaid millions of dollars for freight shipping as a result of the Reweighing Misconduct, and seeks civil penalties of $385–770 million, as well as treble damages under the FCA from YRC Freight, Yellow Transportation, and Roadway Express.

154.    The FCA imposes liability on persons who, and companies that, defraud government programs. Specifically, the FCA provides that any person who knowingly makes, submits, or causes false or fraudulent claims for federal funds is liable to the U.S. Government for civil penalties and damages. 31 U.S.C. § 3729(a)(1) (through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A). The FCA further establishes liability for any person who knowingly makes, uses, or causes false records or statements material to false or fraudulent claims for federal funds. 31 U.S.C. § 3729(a)(1)(B).

155.    For conduct that occurred prior to May 20, 2009, the FCA establishes liability for any person who knowingly makes, uses, or causes a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the federal government. 31 U.S.C. § 3729(a)(7) (through May 19, 2009). For conduct that occurred between May 19, 2009 and the present, the FCA establishes liability for any person who knowingly makes, uses, or causes a false record or statement material to an obligation to pay or transmit money to the government, or any person who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

156. Following the 2009 merger between Roadway Express and Yellow Transportation, YRC Freight continued to systematically engage in a practice of suppressing negative reweigh corrections for its DOD shipments until at least October 2013. *See* Exhibit F. This fraudulent practice also extended to the Company's other customers.

157. Evidence obtained through the DOD Action reveals that YRC Freight, Roadway Express, and Yellow Transportation knew that their reweigh practices were fraudulent and that they were utilizing a policy of overcharging customers by voiding negative reweigh results.

158. Moreover, YRC Freight, Roadway Express, and Yellow Transportation took steps to deliberately conceal evidence of the Reweighing Misconduct.

159. Between September 2005 and June 2010, YRC Freight, Roadway Express, and Yellow Transportation did not keep a record of the negative reweigh corrections they systematically cancelled, and from at least June 2009 through June 2010, they concealed evidence of their misconduct by programming their computer systems so negative reweigh results would not register. Upon information and belief, Yellow Transportation's systems were reprogrammed at some point in 2006 to conform to Roadway Express's fraudulent practice of ignoring negative reweigh corrections, both upward and downward, if such corrections were less than approximately 30-40 pounds. The new system was put into play at the behest of executives at Yellow Transportation, Roadway Express, and their parent company, YRC. Roadway Express had been implementing such practices from as early as 2004.

160. YRC Freight's computer system, for instance, automatically rejected negative reweigh inputs and recorded the reason for such rejections as "CAN NOT FIND EMPLOYEE NUMBER," despite the fact that "NEGATIVE WEIGHT CORRECTION PROHIBITED" was a possible error code that YRC Freight's computer system listed and was capable of recording.

161.     On March 17, 2009, Don Geisler ("Geisler"), a YRC Freight business development executive, reported to Whitsel via email six instances of negative reweigh corrections, stating that he "noticed that we are passing along changes in favor of the customer … when the weight is corrected to a lesser [number] and the corrected revenue results in a lower charge, the savings is passed along to the customer." Geisler further stated that he "thought we had blocked that as part of the 'best practice' synergy work."

162.     Whitsel subsequently forwarded Geisler's email to other YRC Freight employees, stating that he "thought we had stopped negative corrections as part of synergies."

163.     In response to Geisler's email, James Faas ("Faas"), the Company's Director of W&I, stated that for two of the six instances of negative reweigh corrections reported by Geisler, YRC Freight "had an agreement on [sic] to cut back if the weight was found to be lower." Faas stated that the customers who had ordered those two shipments had been informed by former YRC Freight employees that "YRC was cheating them, so the deal was made to retain to [sic] the business."

**The DOJ Investigation, and Continuation of the Reweighing Misconduct**

164.     In or around 2009, the DOJ began investigating the Company in connection with the DOD shipments that the Company had handled. As the Company admits, the DOJ engaged in "extensive pre-filing discovery" in connection with a CID issued by the DOJ. *See* Memorandum in Support of Motion to Dismiss, *United States ex rel. Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc*., Civil Action No. 08-cv-0811 (W.D.N.Y.) (Dkt. No. 83-1 at 5).  In contrast to administrative subpoenas, CIDs allow government entities, such as the DOJ, to make legally-enforceable requests for documents as well as written and oral testimony from third parties.

165.     During this time, the DOJ took deposition testimony and interviewed at least  32 witnesses, including Defendant Welch, and other current or former Company employees who worked at the Company's headquarters in Overland Park, Kansas or offices in Ohio, Florida, Illinois, Michigan, Indiana, New York, and Washington D.C., including Rawson, Gaynor, Smid, Frye, Hacker, Faas, Rick Sheafer, a YRC Freight Director of Quality, and Doug Neiger, a YRC Freight Director of Risk Management. The DOJ also sought and obtained "hundreds of thousands of pages" of documents from the Company relating to DOD shipments for which the DOD was overcharged as a result of the Reweighing Misconduct.

166.     In connection with the DOJ Investigation, beginning in 2009 and extending throughout the Relevant Period, the DOJ interacted with the Company through numerous meetings, presentations, and negotiations, some of which were settlement negotiations. During this same period, the Company retained Dentons US LLP as outside counsel, the U.S. branch of Dentons, the largest law firm in the world by number of attorneys.

167.     Despite the DOJ Investigation, the Company continued to engage in the Reweighing Misconduct, as evidenced by internal emails and discussions between YRC employees during this period. The Company produced hundreds of thousands of documents in connection with the investigation, but additionally failed to maintain vital records and actively concealed records through its programmed computer systems, complicating the DOJ Investigation. An internal email from March 3, 2010 maintained that YRC Freight's computer systems remained programed to "check to see if the reweigh information is negative" and "if so the system will delete all negative reweigh information."

168.     It was no secret that the Company's reweigh practices represented a substantial breach of trust between the Company's customers and placed the business operations of YRC

Freight, Yellow Transportation, and Roadway Express at risk. As established above, if customers were to find out, the carriers would and in fact did make exceptions for customers who realized the Individual Defendants' scheme in order to preserve that customer's business. The Reweighing Misconduct presented a known and actualized threat to each carrier's customers, including DOD officials, who were not aware that the government was being systematically and continuously overcharged for shipments.

169.    On April 7, 2011, a YRC Freight manager stated in an internal email sent after a "talk about integrity this morning," that "perhaps we need to revisit the negative weight correction logic." Another YRC Freight employee responded to the email, stating that YRC Freight's negative reweigh correction policy "has been previously discussed and the decision was made to leave it [the] way that it is currently."

170.    On October 4, 2011, in response to an internal query as to whether negative reweigh corrections counted against a freight terminal's revenue, a YRC Freight employee stated via email that "the customer does not receive a lowered invoice," and that "negative scans never change the mainframe data." A YRC Freight manager further added, "for now we do not systematically [make] negative [reweigh] corrections," but "at some point we may to add further credibility to our process."

171.    Also during this period, a number of current and former YRC employees, cited in the Securities Class Action as confidential witnesses, were aware of and personally witnessed practices that formed part of the Reweighing Misconduct.

172.    Several of these former employees were W&I Coordinators and Managers at various Company freight terminals, and were responsible for overseeing the terminal workers who reweighed shipments. One of these employees, a former W&I Manager identified in the Securities

Class Action as "CW 1," claimed that Company employees were "routinely chastised" for making reweigh corrections that benefited YRC's customers. CW 1 further disclosed that during a November 2013 Company meeting, CW 1 voiced concerns about the Reweighing Misconduct to Defendant Welch, who was in attendance at the meeting. Defendant Welch did not respond to these concerns.

173.    One former W&I Coordinator, identified in the Securities Class Action as "CW 2," worked at the Company's Illinois terminal from August 2015 through March 2018, also stated that the Company specifically trained its employees to target larger customers such as Sears, Roebuck and Company, Wal-Mart Inc., and General Mills, Inc., which were less likely to detect overcharges stemming from the Company's failure to make negative reweigh corrections. CW 2 confirmed that the Company's employees regularly overcharged customers "multiple times a day" and maintained that the Company had "cheat codes" to utilize when customers challenged the weight or charge of a particular shipment. The cheat codes were used to "make-up the [revenue] loss another way." Moreover, according to CW 2, YRC's employees were trained to manipulate the manner in which photos were taken in order to double bill shipments. CW 2 reported to Paul Stegall ("Stegall"), who, upon information and belief, serves as a current W&I Manager at the Company's Akron, Ohio location. CW 2 ultimately left the Company in 2018 as a result of the Company's improper billing policies.

174.    Another Former W&I Coordinator, identified in the Securities Class Action as "CW 3," worked at the Company's Laredo, Texas terminal between May 2012 and April 2015, and was responsible for addressing customer issues relating to freight measurements and weights. CW 3 maintained that Company employees frequently blocked negative reweigh corrections for

customers such as Toyota Motor Corporation and Ford Motor Company, and would often charge customers for the price of a full container when a container was only partially full.

175.    A former W&I Coordinator and Operations Supervisor, identified in the Securities Class Action as "CW 4," who worked at multiple Company freight terminals between 2008 and 2017, claimed that Company employees were instructed to conduct reweighs as often as possible, and received $25 Home Depot gift cards for every 30 reweighs they made. CW 4 confirmed that the Reweighing Misconduct was ongoing during CW 4's tenure at the Company, and claimed that terminal workers frequently forged reweigh results in order to receive the aforementioned rewards. CW 4 also reported to Stegall, who reported up the chain to Faas and YRC's corporate office, and claimed to have objected to improper billing practices CW 4 observed. CW 4 noted that the practices were "SOP" or "standard operating procedure" at the Company and further stated that "it was not SOP to cut weight back…it was a money grab." CW 4, whose responsibilities included investigating customer overcharge claims, stated that the response directive to these claims were to "stay your ground, [and] unless the evidence is overwhelming," refrain from crediting the customer. CW 4 maintained that YRC's account managers knew that the Company was engaging in the Reweighing Misconduct, and that customer complaints were sometimes completely ignored. CW 4 further claimed that Gaynor addressed the topic of negative reweighs with employees on a weekly basis.

176.    One former employee, a former Operations Manager identified in the Securities Class Action as "CW 5," worked for the Company from 2005 through 2012, and was responsible for overseeing dock workers at a Company freight terminal. CW 5 personally witnessed improper billing practices arising out of the Reweighing Misconduct, including forklift operators being

instructed to add extra weight to a shipment in order to turn a negative correction into a positive correction.

177.     CW 5 further claimed that the Reweighing Misconduct has continued for many years since 2012, according to conversations between the former Operations Manager and current YRC employees.

178.     Another former employee, a former W&I Inspection Coordinator identified in the Securities Class Action as "CW 6," worked at Company freight terminals between 2008 and 2010, and also observed Company employees being pressured by the Company's leadership to block negative reweigh corrections. Specifically, CW 6 maintained that Rawson addressed the topic of negative reweighs with employees during weekly telephone conferences, and frequently inquired into the revenue that was generated as a result of the Reweighing Misconduct.

179.     CW 6 also noted that beginning at least in 2008, weight data obtained via scales mounted on Company forklifts was routed through an internal database, which was accessible by Company management.

180.     CW 6 further maintained that the Company had a "hit list" of major companies, including Wal-Mart Inc. and The Home Depot, Inc, which were thought to be easy targets for the Reweighing Misconduct.

181.     According to CW 6, CW 6 often made verbal complaints to Company managers about the practices arising out of the Reweighing Misconduct.

182.     Notwithstanding the concerns of Company employees described herein, the Company continued to engage in the Reweighing Misconduct. Indeed, the Company admitted the existence of these practices, further indicating that the Individual Defendants would have been aware of the Reweighing Misconduct as well. In a memorandum the Company filed on February

12, 2019 in connection with the DOD Action, the Company stated that "the Government never once refused to make a payment to any of the Defendants despite its express knowledge of the weight correction process at issue," and that "[t]he Government, with knowledge of the Defendants' position that it was not required to process negative reweighs, had specific administrative, regulatory and legal remedies to stop payments." Memorandum in Support of Motion to Dismiss, *United States ex rel. Hannum v. Roadway Express, Inc. et al* (Dkt. No. 83-10) at 9–10. The Company also stated that "[t]he Government has been on notice since November 3, 2008 that the Defendants' interpretation of the [MFTRP] allowed them to decide on their own whether to reweigh the freight and to charge for differences between the weight on the bill of lading and the reweighed amount." *Id*. at 15–16. Moreover, the Company further disclosed that the DOD made payments to the Company through at least 2013, and asserted, "[t]he same is true for subsequent tender awards and contract extensions, or new contracts/subcontracts, that were issued with simultaneous knowledge that the Defendants were not processing negative reweighs." *See id.* at 9.

### **The Individual Defendants' Duty to Disclose**

183.    Under applicable SEC rules and regulations, public companies, such as YRC, are required to file financial statements that are prepared in accordance with GAAP. Financial statements that are not in compliance with GAAP are presumed misleading by the SEC.

184.    The SEC recognizes the Financial Accounting Standards Board ("FASB"), as the authoritative source for GAAP. The FASB publishes GAAP in the Accounting Standards Codification (the "ASC").

185.    ASC 450, *Contingencies*, provides the standards for disclosing loss and gain contingencies. ASC 450 lists several examples of loss contingencies, including "[a]ctual or possible claims and assessments," and "[p]ending or threatened litigation." ASC 450-20.

186.    The ASC further provides that a loss contingency must be disclosed if the contingency is reasonably possible, or "more than remote but less than likely." ASC 450-20-50.

187.    As such, under ASC 450, the Individual Defendants had a duty to disclose the DOJ Investigation, because, due to the extensive nature of the investigation, and the nearly ten-year period over which the investigation took place, the Individual Defendants must have been aware that the investigation constituted a reasonably possible threat of litigation.

188.    Moreover, FASB Concepts Statement No. 5 provides that, for financial statements to be in accordance with GAAP, the revenue listed in such statements must be both earned and realized. *See* FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* (2008) at 3. For revenue to be earned, a company must accomplish the task it was contracted to perform to be entitled to payment, and for revenue to be realized, the revenue must be in the form of cash or claims to cash received in exchange for services performed. *See id.* at 21–22.

189.    The revenue generated through the Reweighing Misconduct was not earned, because that revenue was obtained fraudulently by overcharging the Company's customers. Thus, the Company was not entitled to payment for the overcharged amounts. The revenue generated through the Reweighing Misconduct instead should have been recorded as a liability or reserve.

190.    As such, the Individual Defendants caused YRC's financial statements to be in violation of GAAP during the Relevant Period because they materially overstated the Company's

revenue and understated the Company's losses by including illicit revenue generated through the Reweighing Misconduct.

191.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

192.    As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose the Reweighing Misconduct and the DOJ Investigation because the Reweighing Misconduct and the DOJ Investigation constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, and (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income.

**False and Misleading Statements**

*March 10, 2014 Form 10-K*

193.    On March 10, 2014, the Company filed an annual report on Form 10-K with the SEC for the fourth fiscal quarter and year ended December 31, 2013 (the "2013 10-K"), signed by Defendants Welch, Pierson, Fisher, Bromark, Carty, Doheny, Friedman, Hoffman, Kneeland, and Winestock.

194.    Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Welch and Pierson, attesting to the accuracy of the 2013 10-K.

195.    The 2013 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

*Revenue Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance by management and investors. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

In addition, YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage

of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2013 and 2012, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $26.6 million and $20.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based on historical trends. At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

196.     The 2013 10-K disclosed operating revenue of $4.86 billion, operating income of $28.4 million, and a net loss of $83.6 million for the fiscal year ended December 31, 2013.

197.     The 2013 10-K also disclosed operating revenue of $1.2 billion, operating loss of $1.6 million, and a net income of $400,000 for the fiscal quarter ended December 31, 2013.

198.     According to the 2013 10-K, the components of YRC's operating revenue included "two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment.)"

199.     The 2013 10-K addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any

future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations.  In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.

We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

200.    The 2013 10-K also made the following representations with respect to the

Company's compliance with GAAP:

Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

201.    The 2013 10-K contained a number of exhibits, including certain "material

contracts" such as the "Credit Agreement dated as of February 13, 2014, by and among [YRC], as

borrower, the subsidiaries of the borrower party thereto from time to time, the lenders from time

to time party thereto, and Credit Suisse AG, Cayman Islands Branch, as administrative agent for

the lenders", and the "Loan and Security Agreement, dated as of February 13, 2014, among [YRC],

as administrative borrower, the other borrowers named therein, the guarantors named therein,

certain financial institutions, as lenders, and RBS Citizens Business Capital a division of RBS

Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent, and RBS Citizens, N.A., Merrill

Lynch, Pierce, Fenner & Smith and CIT Finance LLC, as joint lead arrangers and joint

bookrunners[.]" The contracts contained "Representations and Warranties" sections, falsely

guaranteeing that the Company was in compliance with all laws.

202.   The representations made in the 2013 10-K concerning the Company's financial results for the fiscal year ended December 31, 2013 were false and misleading because, *inter alia*, they overstated the Company's operating revenue and operating income by $24 million and understated the Company's net income, which was actually a net loss, by $24 million.[6]

203.   The representations made in the 2013 10-K concerning the Company's financial results for the fiscal quarter ended December 31, 2013 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

204.   Moreover, statements regarding the Company's operating revenue were materially misleading because they failed to disclose that YRC generated a significant portion of its revenue from the Reweighing Misconduct. Also, while the 2013 10-K disclosed certain litigation or other legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

**March 18, 2014 Proxy Statement**

205.   On March 18, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement"). Defendants Welch, Bromark, Carty, Doheny, Friedman, Hoffman, Kneeland, and Winestock solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

---

[6] As alleged herein, through the Reweighing Misconduct, the Company received estimated illicit revenue of at least $2 million per month, or $6 million per quarter, causing the Company's financial statements to report overstated revenue and income and understated losses.

[7] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

206.    The 2014 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The 2014 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by one of the Individual Defendants.

207.    The Individual Defendants further caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

208.    The 2014 Proxy Statement also called for a shareholder vote to approve the Company's "Amended and Restated 2011 Incentive and Equity Award Plan," which set forth performance awards for officers and directors. The misrepresentations and omissions set forth herein were material to shareholders in voting on this matter.

209.    The 2014 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result

of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 1, 2014 Form 8-K and Form 10-Q*

210.     On May 1, 2014, the Company filed with the SEC a report on Form 8-K (the "May 2014 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2014.

211.     The May 2014 8-K disclosed operating revenue of $1.21 billion, consolidated operating loss of $32.4 million, and a net loss of $70.2 million for the fiscal quarter ended March 31, 2014.

212.     That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended March 31, 2014 on a Form 10-Q (the "May 2014 10-Q"). The May 2014 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the May 2014 10-Q.

213.     The May 2014 10-Q made the same representations as the May 2014 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended March 31, 2014.

214.     Concerning the Company's operating revenue, the May 2014 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

215.     The May 2014 10-Q addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no

assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

216.    The representations made in the May 2014 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended March 31, 2014 were false and misleading because they overstated the Company's operating revenue by $6 million, understated the Company's consolidated operating loss and net loss by $6 million.

217.    Moreover, while the May 2014 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### July 31, 2014 Form 8-K and Form 10-Q

218.    On July 31, 2014, the Company filed with the SEC a report on Form 8-K (the "July 2014 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2014.

219.    The July 2014 8-K disclosed operating revenue of $1.31 billion, consolidated operating income of $20 million, and a net loss of $4.9 million for the fiscal quarter ended June 30, 2014.

220.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2014 on a Form 10-Q (the "July 2014 10-Q"). The July 2014 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the July 2014 10-Q.

221.   The July 2014 10-Q made the same representations as the July 2014 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended June 30, 2014.

222.   Concerning the Company's operating revenue, the July 2014 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

223.   The July 2014 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

224.   The representations made in the July 2014 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2014 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

225.   Moreover, while the July 2014 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

*October 30, 2014 Form 8-K and 10-Q*

226.    On October 30, 2014, the Company filed with the SEC a report on Form 8-K (the "October 2014 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2014.

227.    The October 2014 8-K disclosed operating revenue of $1.32 billion, consolidated operating income of $26.7 million, and net income of $1.2 million for the fiscal quarter ended September 30, 2014.

228.    The October 2014 8-K also stated, with respect to the Company's pricing strategy, that "[e]xecuting on our strategy of improving price and managing our freight mix to ensure that we have the right freight at the right price will continue to be a priority."

229.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2014 on a Form 10-Q (the "October 2014 10-Q"). The October 2014 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the October 2014 10-Q.

230.    The October 2014 10-Q made the same representations as the October 2014 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended September 30, 2014.

231.    Concerning the Company's operating revenue, the October 2014 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

232.    The October 2014 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

233.    The representations made in the October 2014 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended September 30, 2014 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net income by $6 million.

234.    Moreover, while the October 2014 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

***February 5, 2015 Form 8-K***

235.    On February 5, 2015, the Company filed with the SEC a report on Form 8-K (the "February 2015 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter and year ended December 31, 2014.

236.    The February 2015 8-K disclosed operating revenue of $1.21 billion, consolidated operating income of $31.2 million, and net income of $6.2 million for the fiscal quarter ended December 31, 2014.

237.    The February 2015 8-K also disclosed operating revenue of $5.06 billion, consolidated operating income of $45.5 million, and a net loss of $67.7 million for the fiscal year ended December 31, 2014.

238.     The representations made in the February 2015 8-K concerning the Company's financial results for the fiscal quarter ended December 31, 2014 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and overstated the Company's net income by $6 million.

239.     The representations made in the February 2015 8-K concerning the Company's financial results for the fiscal year ended December 31, 2014 were false and misleading because they overstated the Company's operating revenue and operating income by $24 million and understated the Company's net loss by $24 million.

### *February 20, 2015 Form 10-K*

240.     On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K"), signed by Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, and Winestock.

241.     Attached to the 2014 10-K were SOX certifications signed by Defendants Welch and Pierson, attesting to the accuracy of the 2014 10-K.

242.     The 2014 10-K made the same representations as the February 2015 8-K with respect to the Company's operating revenue, operating income, and net loss for the fiscal quarter and year ended December 31, 2014.

243.     The 2014 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### *Revenue Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance by management and

investors. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

In addition, YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2014 and 2013, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $27.1 million and $26.6 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2014 and 2013, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively.

244.    The 2014 10-K addressed YRC's "Commitment, Contingencies and Uncertainties"

and "Other Legal Matters," stating, in relevant part:

Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our

management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations.  In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.

We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

245.   The 2014 10-K also made the following representations with respect to the Company's compliance with GAAP:

Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

246.   The representations made in the 2014 10-K concerning the Company's financial results for the fiscal quarter and year ended December 31, 2014 were false and misleading for the same reasons listed in ¶¶238–239.

247.   Moreover, statements regarding the Company's operating revenue were materially misleading because they failed to disclose that YRC generated a significant portion of its revenue from the Reweighing Misconduct. Also, while the 2014 10-K disclosed certain litigation or other legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *March 17, 2015 Proxy Statement*

248.    On March 17, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, and Winestock solicited the 2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

249.    The 2015 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The 2015 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

250.    The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

251.    The 2015 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 30, 2015 Form 8-K and 10-Q*

252.    On April 30, 2015, the Company filed with the SEC a report on Form 8-K (the "April 2015 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2015.

253.    The April 2015 8-K disclosed operating revenue of $1.18 billion, consolidated operating income of $3.7 million, and a net loss of $21.6 million for the fiscal quarter ended March 31, 2015.

254.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended March 31, 2015 on a Form 10-Q (the "April 2015 10-Q"). The April 2015 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the April 2015 10-Q.

255.    The April 2015 10-Q made the same representations as the April 2015 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended March 31, 2015.

256.    Concerning the Company's operating revenue, the April 2015 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

257.    The April 2015 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

258.    The representations made in the April 2015 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended March 31, 2015 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

259.    Moreover, while the April 2015 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *July 30, 2015 Form 8-K and 10-Q*

260.    On July 30, 2015, the Company filed with the SEC a report on Form 8-K (the "July 2015 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2015.

261.    The July 2015 8-K disclosed operating revenue of $1.25 billion, operating income of $56.9 million, and net income of $26 million for the fiscal quarter ended June 30, 2015.

262.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2015 on a Form 10-Q (the "July 2015 10-Q"). The July 2015 10-Q was

signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the July 2015 10-Q.

263.    The July 2015 10-Q made the same representations as the July 2015 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended June 30, 2015.

264.    Concerning the Company's operating revenue, the July 2015 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

265.    The July 2015 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

266.    The representations made in the July 2015 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2015 were false and misleading because they overstated the Company's operating revenue, operating income, and net income by $6 million.

267.    Moreover, while the July 2015 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

*October 29, 2015 Form 8-K and 10-Q*

268.    On October 29, 2015, the Company filed with the SEC a report on Form 8-K (the "October 2015 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2015.

269.    The October 2015 8-K disclosed operating revenue of $1.24 billion, consolidated operating income of $47.7 million, and net income of $19.8 million for the fiscal quarter ended September 30, 2015.

270.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2015 on a Form 10-Q (the "October 2015 10-Q"). The October 2015 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the October 2015 10-Q.

271.    The October 2015 10-Q made the same representations as the October 2015 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended September 30, 2015.

272.    Concerning the Company's operating revenue, the October 2015 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

273.    The October 2015 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information

available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

274. The representations made in the October 2015 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended September 30, 2015 were false and misleading because they overstated the Company's operating revenue, operating income, and net income by $6 million.

275. Moreover, while the October 2015 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *February 2, 2016 Form 8-K*

276. On February 2, 2016, the Company filed with the SEC a report on Form 8-K (the "February 2016 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter and year ended December 31, 2015.

277. The February 2016 8-K disclosed operating revenue of $1.14 billion, consolidated operating loss of $15.3 million, and a net loss of $23.5 million for the fiscal quarter ended December 31, 2015.

278. The February 2016 8-K also disclosed consolidated operating revenue of $4.83 billion, consolidated operating income of $93 million, and net income of $700,000 for the fiscal year ended December 31, 2015.

279. The representations made in the February 2016 8-K concerning the Company's financial results for the fiscal quarter ended December 31, 2015 were false and misleading because they overstated the Company's operating revenue by $6 million and understated the Company's operating loss and net loss by $6 million.

280.    The representations made in the February 2016 8-K concerning the Company's financial results for the fiscal year ended December 31, 2015 were false and misleading because they overstated the Company's operating revenue and operating income by $24 million and understated the Company's net income, which was actually a net loss, by $24 million.

### *February 11, 2016 BB&T Conference*

281.    On February 11, 2016, Defendants Welch and Pierson attended the 2016 BB&T Transportation Services Conference. At the conference, an analyst questioned Defendant Pierson about the Company's methods of weighing and measuring the volume of its shipments. In response, Defendant Pierson stated, in relevant part:

> We are capturing not only the cube of that shipment, the weight of that shipment, the class of that shipment, the distance of that shipment, how many times we touch that shipment—so we're scraping as much data as possible off every single shipment that we can scan . . . it allows us to improve the intelligence of our pricing model.

282.    Defendant Pierson's statements regarding the data that YRC collects from its shipments were materially false and misleading because the Company failed to make negative reweigh corrections, and as such, the Company's pricing model did not account for negative reweighs.

### *February 18, 2016 Form 10-K*

283.    On February 18, 2016, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K"), signed by Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

284.    Attached to the 2015 10-K were SOX certifications signed by Defendants Welch and Pierson, attesting to the accuracy of the 2015 10-K.

285.   The 2015 10-K made the same representations as the February 2016 8-K with respect to the Company's operating revenue, operating income, and net income for the fiscal quarter and year ended December 31, 2015.

286.   The 2015 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### Revenue Recognition and Revenue-related Reserves

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2015 and 2014, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $24.0 million and $27.1 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight

verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively.

287.     Concerning the Company's operating revenue, the 2015 10-K also stated, in relevant part, "[o]perating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

288.     The 2015 10-K addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations.  In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.
>
> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

289.     The 2015 10-K also made the following representations with respect to the Company's compliance with GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

290.    The representations made in the 2015 10-K concerning the Company's financial results for the fiscal quarter and year ended December 31, 2015 were false and misleading for the same reasons listed in ¶¶279–280.

291.    Moreover, statements regarding the Company's operating revenue were materially misleading because they failed to disclose that YRC generated a significant portion of its revenue from the Reweighing Misconduct. Also, while the 2015 10-K disclosed certain litigation or other contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *February 18, 2016 Letter to Shareholders*

292.    On or around February 18, 2016, the same day the 2015 10-K was filed, the Company posted a version of the 2015 10-K on its website that included an additional letter signed by Defendant Welch, titled, "A MESSAGE TO SHAREHOLDERS" (the "February 2016 Letter").

293.    In relevant part, the February 2016 Letter stated, "[s]taying committed to our strategy was a key driver in improving adjusted EBITDA by almost $90 million to $333 million."

294.    The representations made by Defendant Welch in the February 2016 letter concerning the Company's commitment to its strategy were false and misleading because they failed to disclose that a major part of the Company's strategy involved overcharging its customers through the Reweighing Misconduct, creating artificially inflated shipping prices.

### *March 17, 2016 Proxy Statement*

295.    On March 17, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

296.    The 2016 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

297.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

298.    The 2016 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 28, 2016 Form 8-K and 10-Q

299.    On April 28, 2016, the Company filed with the SEC a report on Form 8-K (the "April 2016 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2016.

300.    The April 2016 8-K disclosed consolidated operating revenue of $1.12 billion, consolidated operating income of $13.4 million, and a net loss of $12 million for the fiscal quarter ended March 31, 2016.

301.    In the April 2016 8-K, Defendant Welch addressed the Company's pricing strategy, stating, in relevant part, "[w]hile we have made significant strides, we must balance the volume equation with our strategy to get the right freight at the right price running through our networks . . . Our intent is to remain disciplined and true to this strategy."

302.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended March 31, 2016 on a Form 10-Q (the "April 2016 10-Q"). The April 2016 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the April 2016 10-Q.

303.    The April 2016 10-Q made the same representations as the April 2016 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended March 31, 2016.

304.    Concerning the Company's operating revenue, the April 2016 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

305.    The April 2016 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

306.    The representations made in the April 2016 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended March 31, 2016 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

307.    Moreover, while the April 2016 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *July 28, 2016 Form 8-K and 10-Q*

308.    On July 28, 2016, the Company filed with the SEC a report on Form 8-K (the "July 2016 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2016.

309.    The July 2016 8-K disclosed consolidated operating revenue of $1.2 billion, consolidated operating income of $57.2 million, and net income of $27.1 million for the fiscal quarter ended June 30, 2016.

310.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2016 on a Form 10-Q (the "July 2016 10-Q"). The July 2016 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the July 2016 10-Q.

311.    The July 2016 10-Q made the same representations as the July 2016 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended June 30, 2016.

312.    Concerning the Company's operating revenue, the July 2016 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

313.    The July 2016 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

314.    The representations made in the July 2016 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2016 were false and misleading

because they overstated the Company's operating revenue, operating income, and net income by $6 million.

315.     Moreover, while the July 2016 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *October 27, 2016 Form 8-K and 10-Q*

316.     On October 27, 2016, the Company filed with the SEC a report on Form 8-K (the "October 2016 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2016.

317.     The October 2016 8-K disclosed consolidated operating revenue of $1.2 billion, consolidated operating income of $38.8 million, and net income of $13.9 million for the fiscal quarter ended September 30, 2016.

318.     That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2016 on a Form 10-Q (the "October 2016 10-Q"). The October 2016 10-Q was signed by Defendants Welch and Pierson, and contained SOX certifications signed by Defendants Welch and Pierson attesting to the accuracy of the October 2016 10-Q.

319.     The October 2016 10-Q made the same representations as the October 2016 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended September 30, 2016.

320.     Concerning the Company's operating revenue, the October 2016 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

321.    The October 2016 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

322.    The representations made in the October 2016 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2016 were false and misleading because they overstated the Company's operating revenue, operating income, and net income by $6 million.

323.    Moreover, while the October 2016 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *February 6, 2017 Form 8-K*

324.    On February 6, 2017, the Company filed with the SEC a report on Form 8-K (the "February 2017 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter and year ended December 31, 2016.

325.    The February 2017 8-K disclosed operating revenue of $1.14 billion, consolidated operating income of $14.9 million, and a net loss of $7.5 million for the fiscal quarter ended December 31, 2016.

326.   The February 2017 8-K also disclosed consolidated operating revenue of $4.69 billion, consolidated operating income of $124.3 million, and net income of $21.5 million for the fiscal year ended December 31, 2016.

327.   The representations made in the February 2017 8-K concerning the Company's financial results for the fiscal quarter ended December 31, 2016 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

328.   The representations made in the February 2017 8-K concerning the Company's financial results for the fiscal year ended December 31, 2016 were false and misleading because they overstated the Company's operating revenue, operating income, and net income by $24 million.

329.   In the February 2017 8-K, Defendant Welch addressed the Company's pricing strategy, stating, in relevant part, that "[o]ur pricing strategy remains focused on profitability while delivering award-winning customer service."

### *February 17, 2017 Form 10-K*

330.   On February 17, 2017, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Welch, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

331.   Attached to the 2016 10-K were SOX certifications signed by Defendants Welch and Fisher, attesting to the accuracy of the 2016 10-K.

332.    The 2016 10-K made the same representations as the February 2017 8-K with respect to the Company's operating revenue, operating income, and net income for the fiscal quarter and year ended December 31, 2016.

333.    The 2016 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### Revenue Recognition and Revenue-related Reserves

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2016 and 2015, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $25.0 million and $24.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight

verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2016 and 2015, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively.

334.    Concerning the Company's operating revenue, the 2016 10-K also stated, in relevant part, "[o]perating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

335.    The 2016 10-K addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations.  In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.
>
> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

336.    The 2016 10-K also made the following representations with respect to the Company's compliance with GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

337.    The representations made in the 2016 10-K concerning the Company's financial results for the fiscal quarter and year ended December 31, 2016 were false and misleading for the same reasons listed in ¶¶328–329.

338.    Moreover, statements regarding the Company's operating revenue were materially misleading because they failed to disclose that YRC generated a significant portion of its revenue from the Reweighing Misconduct. Also, while the 2016 10-K disclosed certain litigation or other legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *March 21, 2017 Proxy Statement*

339.    On March 21, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

340.    The 2017 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

the Reweighing Misconduct, and the insider trading engaged in by six of the Individual Defendants.

341.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

342.    The 2017 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 4, 2017 Form 8-K and 10-Q*

343.    On May 4, 2017, the Company filed with the SEC a report on Form 8-K (the "May 2017 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2017.

344.    The May 2017 8-K disclosed consolidated operating revenue of $1.17 billion, consolidated operating loss of $3 million, and a net loss of $25.3 million for the fiscal quarter ended March 31, 2017.

345.     In the May 2017 8-K, Defendant Welch addressed the Company's pricing strategy, stating, in relevant part, that "[w]e expect the improvement in year-over-year tonnage per day to help us execute our strategy of pricing for profitability and moving shipments through YRC Freight, Holland, Reddaway and New Penn's networks that have favorable freight characteristics."

346.     That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended March 31, 2017 on a Form 10-Q (the "May 2017 10-Q"). The May 2017 10-Q was signed by Defendants Welch and Fisher, and contained SOX certifications signed by Defendants Welch and Fisher attesting to the accuracy of the May 2017 10-Q.

347.     The May 2017 10-Q made the same representations as the May 2017 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended March 31, 2017.

348.     Concerning the Company's operating revenue, the May 2017 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

349.     The May 2017 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

350.    The representations made in the May 2017 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended March 31, 2017 were false and misleading because they overstated the Company's operating revenue and operating loss by $6 million and understated the Company's net loss by $6 million.

351.    Moreover, while the May 2017 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### August 3, 2017 Form 8-K and 10-Q

352.    On August 3, 2017, the Company filed with the SEC a report on Form 8-K (the "August 2017 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2017.

353.    The August 2017 8-K disclosed consolidated operating revenue of $1.26 billion, consolidated operating income of $50 million, and net income of $19 million for the fiscal quarter ended June 30, 2017.

354.    In the August 2017 8-K, Defendant Welch addressed the Company's pricing strategy, stating, in relevant part, that "[a]s we look to the second half of 2017, we expect that meeting our customers' needs, pricing for profitability and diligently managing costs should contribute to improved year-over-year financial performance."

355.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2017 on a Form 10-Q (the "August 2017 10-Q"). The August 2017 10-Q was signed by Defendants Welch and Fisher, and contained SOX certifications signed by Defendants Welch and Fisher attesting to the accuracy of the August 2017 10-Q.

356.     The August 2017 10-Q made the same representations as the August 2017 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended June 30, 2017.

357.     Concerning the Company's operating revenue, the August 2017 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

358.     The August 2017 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

359.     The representations made in the August 2017 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2017 were false and misleading because they overstated the Company's operating revenue and operating loss by $6 million and overstated the Company's net loss by $6 million.

360.     Moreover, while the August 2017 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *November 2, 2017 Form 8-K and 10-Q*

361.    On November 2, 2017, the Company filed with the SEC a report on Form 8-K (the "November 2017 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2017.

362.    The November 2017 8-K disclosed consolidated operating revenue of $1.25 billion, consolidated operating income of $40.1 million, and net income of $3 million for the fiscal quarter ended September 30, 2017.

363.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2017 on a Form 10-Q (the "November 2017 10-Q"). The November 2017 10-Q was signed by Defendants Welch and Fisher, and contained SOX certifications signed by Defendants Welch and Fisher attesting to the accuracy of the November 2017 10-Q.

364.    The November 2017 10-Q made the same representations as the November 2017 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended September 30, 2017.

365.    Concerning the Company's operating revenue, the November 2017 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

366.    The November 2017 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information

available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

367.    The representations made in the November 2017 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended September 30, 2017 were false and misleading because they overstated the Company's operating revenue and operating loss by $6 million and understated the Company's net loss by $6 million.

368.    Moreover, while the November 2017 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### *November 7, 2017 Stephens Fall Conference*

369.    On November 7, 2017, Defendant Welch attended the annual Stephens Fall Investment Conference. During the conference, an analyst questioned Defendant Welch about how the Company's pricing and shipment yields compared to other companies in the shipping industry. In response, Defendant Welch stated, in relevant part:

> I don't know that we'd necessarily compare ourselves to our competition just on yield.  We want to look at a lot of things: length of haul, revenue per shipment, weight per shipment.  So we do what we think is best for our Company and I'm sure other companies do what's best for their company

370.    Defendant Welch's statements regarding YRC's pricing and yields as compared to its competitors were materially false and misleading because YRC, unlike other shipping companies, did not make negative reweigh corrections, and overcharged its customers.

### *February 1, 2018 Form 8-K*

371.    On February 1, 2018, the Company filed with the SEC a report on Form 8-K (the "February 2018 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter and year ended December 31, 2017.

372.   The February 2018 8-K disclosed operating revenue of $1.2 billion, consolidated operating income of $11.3 million, and a net loss of $7.5 million for the fiscal quarter ended December 31, 2017.

373.   The February 2018 8-K also disclosed operating revenue of $4.9 billion, operating income of $98.4 million, and a net loss of $10.8 million for the fiscal year ended December 31, 2017.

374.   The representations made in the February 2018 8-K concerning the Company's financial results for the fiscal quarter ended December 31, 2018 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and understated the Company's net loss by $6 million.

375.   The representations made in the February 2018 8-K concerning the Company's financial results for the fiscal year ended December 31, 2017 were false and misleading because they overstated the Company's operating revenue and operating income by $24 million and understated the Company's net loss by $24 million.

***February 15, 2018 Form 10-K***

376.   On February 15, 2018, the Company filed an annual report on Form 10-K with the SEC for the fiscal fourth quarter and year ended December 31, 2017 (the "2017 10-K"), signed by Defendants Welch, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock.

377.   Attached to the 2017 10-K were SOX certifications signed by Defendants Welch and Fisher, attesting to the accuracy of the 2017 10-K.

378.   The 2017 10-K made the same representations as the February 2018 8-K with respect to the Company's operating revenue, operating income, and net income for the fiscal quarter and year ended December 31, 2017.

379.   The 2017 10-K noted Company policies on revenue reserves and revenue recognition, YRC Freight's responsibility to its customers for proper shipment, and YRC's identification of incorrect prices, stating, in relevant part:

### Revenue Recognition and Revenue-related Reserves

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. . . . At December 31, 2017 and 2016, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $28.1 million and $25.0 million, respectively.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.,* prices) could be identified based on many factors, including weight

verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.

380.    Concerning the Company's operating revenue, the 2017 10-K also stated, in relevant part, "[o]perating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

381.    The 2017 10-K addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations.  In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.
>
> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

382.    The 2017 10-K also made the following representations with respect to the Company's compliance with GAAP:

Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

383.   The representations made in the 2017 10-K concerning the Company's financial results for the fiscal quarter and year ended December 31, 2017 were false and misleading for the same reasons listed in ¶¶374–375.

384.   Moreover, statements regarding the Company's operating revenue were materially misleading because they failed to disclose that YRC generated a significant portion of its revenue from the Reweighing Misconduct. Also, while the 2017 10-K disclosed certain litigation or other contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### March 19, 2018 Proxy Statement

385.   On March 19, 2018, the Company filed the 2018 Proxy Statement. Defendants Welch, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

386.   The 2018 Proxy Statement stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

the Reweighing Misconduct, and the insider trading engaged in by six of the Individual Defendants.

387.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct.

388.    The 2018 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 3, 2018 Form 8-K and 10-Q

389.    On May 3, 2018, the Company filed with the SEC a report on Form 8-K (the "May 2018 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2018.

390.    The May 2018 8-K disclosed consolidated operating revenue of $1.2 billion, consolidated operating loss of $4.3 million, and a net loss of $14.6 million for the fiscal quarter ended March 31, 2018.

391. That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended March 31, 2018 on a Form 10-Q (the "May 2018 10-Q"). The May 2018 10-Q was signed by Defendants Hawkins and Fisher, and contained SOX certifications signed by Defendants Hawkins and Fisher attesting to the accuracy of the May 2018 10-Q.

392. The May 2018 10-Q made the same representations as the May 2018 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended March 31, 2018.

393. Concerning the Company's operating revenue, the May 2018 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

394. The May 2018 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

395. The representations made in the May 2018 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended March 31, 2018 were false and misleading because they overstated the Company's operating revenue by $6 million and understated the Company's operating loss and net loss by $6 million.

396.    Moreover, while the May 2018 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

### August 2, 2018 Form 8-K and 10-Q

397.    On August 2, 2018, the Company filed with the SEC a report on Form 8-K (the "August 2018 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2018.

398.    The August 2018 8-K disclosed consolidated operating revenue of $1.32 billion, consolidated operating income of $50.9 million, and net income of $14.4 million for the fiscal quarter ended June 30, 2018.

399.    In the August 2018 8-K, Defendant Hawkins addressed the Company's pricing strategy, stating, in relevant part:

> During the second quarter we maintained our focus on improving yield and securing the right freight from our customers who value the service and capacity that Holland, New Penn, Reddaway and YRC Freight provide. This strategy contributed to solid year-over-year increases in revenue per hundredweight and revenue per shipment that outpaced contractual cost increases.

400.    That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2018 on a Form 10-Q (the "August 2018 10-Q"). The August 2018 10-Q was signed by Defendants Hawkins and Fisher, and contained SOX certifications signed by Defendants Hawkins and Fisher attesting to the accuracy of the August 2018 10-Q.

401.    The August 2018 10-Q made the same representations as the August 2018 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended June 30, 2018.

402.     Concerning the Company's operating revenue, the August 2018 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

403.     The August 2018 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

404.     The representations made in the August 2018 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended June 30, 2018 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and overstated the Company's net income by $6 million.

405.     Moreover, while the August 2018 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

***November 1, 2018 Form 8-K and 10-Q***

406.     On November 1, 2018, the Company filed with the SEC a report on Form 8-K (the "November 2018 8-K"), which contained a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2018.

407.     The November 2018 8-K disclosed consolidated operating revenue of $1.3 billion, consolidated operating income of $41.2 million, and net income of $2.9 million for the fiscal quarter ended September 30, 2018.

408.     The November 2018 8-K also contained the following statements made by Defendant Hawkins addressing the Company's pricing strategy:

> "Pricing discipline and demand trends remained strong in third quarter with yearover-year growth in operating revenue, revenue per hundredweight and revenue per shipment statistics, both including and excluding fuel surcharge," stated Darren Hawkins, chief executive officer of YRC Worldwide. "I am pleased with our focused discipline on growing yield and securing the right freight mix for our networks, while balancing our capacity constraints, minimizing third-party costs for local purchased transportation and reducing short-term rentals."

409.     That same day, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2018 on a Form 10-Q (the "November 2018 10-Q"). The November 2018 10-Q was signed by Defendants Hawkins and Fisher, and contained SOX certifications signed by Defendants Hawkins and Fisher attesting to the accuracy of the November 2018 10-Q.

410.     The November 2018 10-Q made the same representations as the November 2018 8-K with respect to the Company's operating revenue, consolidated operating loss, and net loss for the fiscal quarter ended September 30, 2018.

411.     Concerning the Company's operating revenue, the November 2018 10-Q also stated, in relevant part, "[o]ur operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

412.     The November 2018 10-Q also addressed YRC's "Commitment, Contingencies and Uncertainties" and "Other Legal Matters," stating, in relevant part:

We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

413.    The representations made in the November 2018 8-K and 10-Q concerning the Company's financial results for the fiscal quarter ended September 30, 2018 were false and misleading because they overstated the Company's operating revenue and operating income by $6 million and overstated the Company's net income by $6 million.

414.    Moreover, while the November 2018 10-Q disclosed certain litigation or legal contingencies facing the Company, it failed to disclose the extensive investigation the DOJ was conducting, which exposed the Company to significant potential liability under the FCA.

415.    The statements in ¶¶193–201, 210–215, 218–223, 226–232, 235–237, 240–245, 252–257, 260–265, 268–273, 276–278, 281, 283–289, 292–293, 299–305, 308–313, 316–321, 324–326, 329–336, 343–349, 352–358, 361–366, 369, 371–373, 376–382, 389–394, 397–403, and 406–412 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the

Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

416.    On December 14, 2018, the DOJ issued a press release announcing that the United States had filed a complaint in intervention in the DOD Action against YRC Freight, Roadway Express, and Yellow Transportation for "systematically overcharg[ing] the government" and "ma[king] false statements to the government that hid their misconduct[.]"

417.    The press release provided, in relevant part:

**United States Sues Freight Companies for Systematic Overcharging of Shipments**

The United States has filed a complaint in the Western District of New York against YRC Freight Inc., (YRC); Roadway Express Inc. (Roadway); and Yellow Transportation Inc. (Yellow), alleging that these companies systematically overcharged the government for freight carrier services and made false statements to the government that hid their misconduct, the Justice Department announced today.

The United States filed this lawsuit in U.S. District Court in Buffalo, New York. The United States alleges that, for more than seven years, the defendants defrauded the Department of Defense by millions of dollars for shipments that were actually lighter, and thus cheaper, than the weights for which the defendants charged the government. The United States further alleges that the defendants knowingly made or used false statements concealing their overcharging practices to the Department of Defense.

"Those who do business with the government must do so fairly and honestly," said Assistant Attorney General Jody Hunt of the Department of Justice's Civil Division. "Knowingly overcharging the government is an affront to American taxpayers, and the Department of Justice will seek to ensure that those who engage in such misconduct are held accountable."

418.    The press release discussed specific allegations against the companies, stating, in relevant part:

Specifically, the United States' lawsuit alleges that the defendants reweighed thousands of shipments and suppressed the results whenever they indicated that a

shipment was actually lighter than its original estimated weight. Thus, instead of charging the Department of Defense for shipments based on the correct weight, the defendants knowingly billed the government (and their other customers) based on weights that they knew to be inflated. The defendants also allegedly made false statements to induce the Department of Defense to use them as freight carriers and further knowingly made or used false statements to improperly avoid their obligations to correct inflated invoices and return overpayments.

"When a federal agency, such as the Department of Defense, enters into a service contract with a private corporation or company, the expectation is that the agreement will be administered in good faith," stated U.S. Attorney James P. Kennedy Jr. for the Western District of New York. "In this case, YRC did not legally fulfill its agreed upon obligations to the Defense Department, choosing instead to line its pockets with tax payer's dollars. Such actions are fraudulent and illegal. This case should serve as a warning to any organization that enters into a contract with the federal government —if you try to rip us off, be prepared to pay a heavy price."

"This complaint is the result of a successful investigation to identify those who seek to profit by defrauding the Defense Department," stated Leigh-Alistair Barzey, Special Agent-in-Charge, Defense Criminal Investigative Service (DCIS), Northeast Field Office. "DCIS will continue to investigate procurement fraud allegations, along with its law enforcement partners, in order to protect U.S. military members and the American tax payer."

419.    Moreover, the press release discussed that the companies were subject to treble damages and civil penalties and the governmental bodies that took part in the investigation, stating, in relevant part:

The original lawsuit in this case was filed by James Hannum under the *qui tam*, or whistleblower, provisions of the False Claims Act. Under the act, private citizens can bring suit on behalf of the United States for false claims and share in any recovery. The act permits the government to intervene in such lawsuits, as it has done here. Those who violate the act are subject to treble damages and civil penalties.

This matter was investigated by the Civil Division's Commercial Litigation Branch, the U.S. Attorney's Office for the Western District of New York, the Defense Criminal Investigative Service, and the United States Army Criminal Investigation Division Command.

420.    That same day, YRC responded to the DOJ press release with its own press release addressing the DOJ's allegations. YRC's press release admitted that the Company had been under investigation by the DOJ for more than nine years, stating, in relevant part:

> OVERLAND PARK, Kan., Dec. 14, 2018 (GLOBE NEWSWIRE) -- (NASDAQ: YRCW) -- After more than 9 years of diligently cooperating with the federal government's inquiries, YRC Freight was informed that the government filed a Complaint in Intervention related to the company's charges for shipments tendered to it for transport during a period prior to 2013. Business with the U.S. Department of Defense currently represents less than one percent of YRC Freight's annual revenue.
>
> "These claims are totally without merit," said Jim Fry, YRCW General Counsel. "We have made every effort over nearly a decade to address the government's questions. We are confident that the evidence will demonstrate YRC Freight acted consistently with our contract and all applicable guidelines. We look forward to continuing to provide essential and valuable logistics services to the U.S. government and all our customers."

421.    Also on December 14, 2018, *The Wall Street Journal* published an article titled, "U.S. Sues Freight Carrier YRC Over Military Shipments," noting that the "trucking company overcharged by 'millions of dollars' over several years."  The article stated, in relevant part:

> The Justice Department is suing a major U.S. freight carrier, alleging that trucking units of YRC Worldwide Inc. overcharged the Pentagon millions of dollars for shipping over several years.
>
> The department said in the lawsuit filed earlier this week that YRC Freight Inc., Roadway Express Inc. and Yellow Transportation Inc. made false statements to the government and defrauded the Department of Defense by inflating weight measurements on bills.
>
> For more than seven years, from 2005 to at least 2013, workers for the companies reweighed thousands of shipments and didn't disclose the results when those weights came in under the original estimate, the lawsuit alleges.
>
> "When a federal agency, such as the Department of Defense, enters into a service contract with a private corporation or company, the expectation is that the agreement will be administered in good faith," U.S. Attorney James P. Kennedy Jr. said in a statement.

* * *

It isn't uncommon to find billing errors of 3% to 5% with freight carriers, said Harold Friedman of Data2Logistics, a Fort Myers, Fla.-based company that arranges for payments between shipping companies and their customers. But improved technology in payment systems should reduce those errors, Mr. Friedman said. "It's amazing to me that carriers can't bill more accurately in today's automated environment."

A whistleblower who worked for Roadway and YRC for more than 30 years filed the original complaint in federal court in Buffalo, N.Y. in 2008. Those allegations spurred the government's investigation, which led to this week's filing. The lawsuit included internal communications from the companies detailing what prosecutors called "dishonest reweigh practices [that] caused them to submit false claims to DOD."

The charges were investigated by the Justice and Defense departments, including the U.S. Army's Criminal Investigation Division Command. Ms. Lynch said one of the challenges investigators faced was that YRC allegedly concealed the true weight of the loads they were carrying. "They discarded negative weight corrections," which made it difficult to estimate the full value of the misstated bills, she said.

422.    On this news, the price per share of YRC stock fell $1.26, or approximately 28.4%,

from the previous day's closing price, to close at $3.17 on December 14, 2018.

423.    On December 17, 2018, Deutsche Bank released a report addressing the DOJ's

December 14, 2018 press release and the DOD Action, which stated, in relevant part:

YRCW sued by DOJ – Shares of YRCW sold off nearly 30% on Friday (vs. the S&P down ~2%) as the Department of Justice (DOJ) filed charges against the company stating that YRC Freight "systematically charged the government" for LTL services provided from the years of 2006-2013. YRCW refuted the claims stating that they are "totally without merit" and stressed its confidence that it acted within the appropriate confines of its contract. Additionally, YRCW noted that its business with the government represents under 1% of total company revenue today, though admittedly we believe this could have been higher five years ago. While details are sparse in regards to an ongoing litigation, we will continue to monitor the situation moving forward.

424.    On February 19, 2019, the Company finally disclosed the DOJ Investigation in its

annual report filed with the SEC on Form 10-K for the fiscal year ended December 31, 2018 (the

"2018 10-K"). This was the first time that the Company divulged the existence of the DOJ

Investigation in any of its financial statements filed with the SEC. In its section titled, "Commitment, Contingencies and Uncertainties," the 2018 10-K stated, in relevant part:

> In December 2018, the United States on behalf of the United States Department of Defense filed a complaint against the Company in the U.S. District in the Western District of New York captioned *United States ex rel. James Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc.*, Civil Action No. 08-0811(A). The complaint alleges that the Company violated the False Claims Act by overcharging the Department of Defense for freight carrier services by failing to comply with the contractual terms of freight contracts between the Department of Defense and the Company and related government procurement rules. The complaint also alleges claims for unjust enrichment and breach of contract and seeks damages, treble damages, civil penalties, attorneys' fees and costs of suit, all in unspecified amounts, under the False Claims Act. Management believes it has meritorious defenses and will vigorously defend this action.

> *       *       *

> Although the Company believes it has meritorious defenses and intends to vigorously defend [the Whistleblower Action] . . . , if resolved against us, could give rise to substantial damages, and an unfavorable outcome or settlement may result in a significant monetary judgment or award against us or a significant monetary payment by us, and could have a material adverse effect on our business, financial conditions and results of operations.

### The Individual Defendants Knowingly Made or Caused the Company to Make the False and Misleading Statements Described Herein

425.    During the Relevant Period, the Individual Defendants were senior officers and directors of the Company, and as such, had access to and control over internal Company documents and communications that detailed the extent of the Reweighing Misconduct, the DOJ Investigation into the Company, and the Company's failure to maintain internal controls.

426.    The Company's Board met a minimum of 42 times between March 10, 2014 and December 14, 2018. The Company's Guidelines on Corporate Governance state that two of the Board's primary responsibilities are to "review the Company's systems and practices designed to bring about compliance with applicable laws and regulations, including its accounting and

financial reporting obligations," and to "review the major risks facing the Company and to help develop strategies to address those risks."

427. The Company's shipping business is the Company's sole source of revenue, and as such, the Reweighing Misconduct, which had a significant impact on the Company's shipping business, operations, and overall strategy, was a major risk facing the Company, as well as a serious compliance issue.

428. Moreover, as described herein, the DOJ Investigation constituted a reasonably likely threat of costly litigation, which also represented a major risk facing the Company. The DOJ's issuance of the CID on the Company put all of the Individual Defendants, who controlled the Company and were responsible for reviewing the Company's major risks, on notice that the DOJ Investigation was ongoing. In connection with the DOJ Investigation, with the Board's approval, the Company retained Dentons US LLP. Dentons is the largest law firm in the world by number of attorneys, and the fact that the Company retained Dentons US LLP evidences that the Individual Defendants were aware of the DOJ Investigation and indicates that the Individual Defendants understood the serious potential ramifications of the DOJ Investigation.

429. As described herein, Defendant Welch, who was President of Yellow Transportation from 2000 through 2007, was privy to a September 29, 2005 discussion among Company management concerning the elimination of negative reweigh corrections. Shortly thereafter, in February 2006, Yellow Transportation ceased making negative reweigh corrections, marking the beginning of Yellow Transportation's involvement in the Reweighing Misconduct. Additionally, according to the former W&I Manager identified in the Securities Class Action as CW 1, Defendant Welch did not respond to concerns CW 1 voiced about the Reweighing Misconduct during a November 2013 meeting.

430. Defendants Welch and Hawkins, as the CEOs and directors of the Company from the beginning of the Relevant Period through July 2018, and from April 2018 through the present, respectively, would have regularly reviewed the most serious risks the Company faced. These risks certainly would have included the risks stemming from the Reweighing Misconduct, as well as the DOJ Investigation, which had been ongoing since 2009. Additionally, Defendant Welch was personally interviewed or deposed by the DOJ in connection with the DOJ Investigation.

431. During the Relevant Period, Defendant Bromark was the Chair of the Audit & Ethics Committee, and Defendants Carty and Friedman served as members of the Audit & Ethics Committee. The Company's Audit & Ethics Committee Charter states that it is the Audit & Ethics Committee's responsibility to "[m]eet periodically with the General Counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company; and (ii) any matters involving potential or ongoing material violations of law by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company by any directors, officers, employees, or agents."

432. The Audit & Ethics Committee Charter further states that it is the Audit & Ethics Committee's responsibility to "[o]versee the Company's risks relating to (i) accounting and financial reporting matters; and (ii) ethics and general compliance matters, and review the adequacy of the Company's overall control environment and controls in selected areas representing significant financial risk, and discuss with the Governance Committee key risk exposures and the steps management has taken to monitor and control such exposures."

433. According to the Audit & Ethics Committee Charter, which states that the Audit & Ethics Committee "shall generally meet at least once each calendar quarter," as well as in annual

Committee-only meetings, and in annual meetings with the Company's internal auditors, independent accounting firm, Company management, and the Company's general counsel, the Audit & Ethics Committee met a minimum of 26 times between March 10, 2014 and December 14, 2018. The risks, accounting matters, and legal and ethical compliance matters the Audit & Ethics Committee was required to review certainly would have included the Reweighing Misconduct and its effects, the DOJ Investigation, and the Company's failure to maintain internal controls. Additionally, the Audit & Ethics Committee periodically reported on these matters to the Board, and discussed and approved the Company's financial statements with all of the Individual Defendants before they were released to the public

434.    Moreover, the scheme to cause the Company to engage in the Reweighing Misconduct and the subsequent scheme to conceal the Reweighing Misconduct and its effects, the DOJ Investigation, and the Company's failure to maintain internal controls from the investing public throughout the Relevant Period was of such a large scale, and was carried out over such an extensive period of time, that these schemes could not have occurred without the awareness and involvement of the Individual Defendants, who controlled the Company.

435.    As such, the Individual Defendants were aware, or were recklessly unaware, of the Reweighing Misconduct, the DOJ Investigation, and the Company's failure to maintain internal controls. Despite this, the Individual Defendants caused the Company to issue the materially false and misleading statements described herein.

436.    The Individual Defendants were motivated to cause the Company to continue engaging in the Reweighing Misconduct, and to conceal the Reweighing Misconduct and the related misrepresentations in the Company's financial statements, the DOJ Investigation, and the Company's failure to maintain internal controls from the investing public in order to increase the

Company's bottom line, and in connection thereto, boost their personal incomes, and in order to artificially inflate the value of the Company's stock during the Relevant Period and to allow the Company to carry out certain material financing transactions.

437.   Specifically, in early 2014, shortly before the beginning of the Relevant Period, the Company engaged in a series of financing transactions in order to raise capital, which included the issuance of $250 million of Company stock at artificially inflated prices.

438.   Deutsche Bank Markets Research issued a report on February 3, 2014 commenting on the Company's financing transactions during that period, which stated, in relevant part:

> Last week, YRCW (Hold, $21.48) announced that it successfully completed a series of transactions that reduced the company's debt by roughly $300 million through the issuance of $250 million of common and preferred stock as well as approximately $50 million in principal of its 6% Convertible Notes were exchanged or converted to common stock. We note that YRCW had reached an agreement with its lenders to extend the deadline to repay the 6% Convertible Notes to February 13, 2014 (from February 1, 2014 previously) and to permit the repayment of the Series A and B Notes with the cash equity proceeds from its equity offerings. In addition, the company extended its pension fund obligations to December 2019. Management is now focused on refinancing its senior debt facilities in mid-to-late February, which is expected to reduce its cash interest expense and extend its various debt maturities.

439.   If the Reweighing Misconduct and its effects on the Company's financial statements had been publicly known during that period, the Company likely would not have been able to successfully raise the capital it did.

440.   Additionally, Defendants Welch, Pierson, Hawkins, Fisher, Bromark, and Davidson engaged in insider sales during the Relevant Period of 383,565, 163,451, 54,413, 5,000, 5,000, and 7,721 shares of Company stock, respectively, at artificially inflated prices. In total, these Defendants netted proceeds of over $10 million, demonstrating their motive in facilitating and participating in the scheme described herein.

441.    Even more revealing is the amount of Defendants Welch's and Pierson's insider sales relative to the sales they made prior to the beginning of Relevant Period. During the three years immediately prior to the beginning of the Relevant Period, Defendant Welch sold a total of 58,000 shares of Company stock, and Defendant Pierson sold a total of 40,000 shares of Company stock, receiving proceeds of $1,454,380 and $974,083, respectively. During the Relevant Period, however, Defendant Welch engaged in insider sales of 383,565 shares of Company stock, and Defendant Pierson engaged in insider sales of 163,451 shares of Company stock, receiving proceeds of $5,877,367, and $2,987,269, respectively. These lucrative sales, made while the value of the Company's stock was artificially inflated due to the Individual Defendants' false statements and omissions made during the Relevant Period, further demonstrates Defendants Welch's and Pierson's motive in facilitating and participating in the scheme described herein.

**DAMAGES TO YRC**

442.    As a direct and proximate result of the Individual Defendants' conduct, YRC has lost and expended, and will lose and expend, many millions of dollars.

443.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its current and former CEOs, and its current and former CFOs, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

444.    Such expenditures include, but are not limited to, legal fees associated with the DOD Action filed against the Company's subsidiaries, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

445.    Such expenditures include, but are not limited to, legal fees associated with additional actions filed against the Company by its customers to recoup the amounts they were

overcharged through the Reweighing Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

446.    Such losses, include, but are not limited to those caused by the loss of customers.

447.    Such expenditures include, but are not limited, to additional cost of financing.

448.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

449.    As a direct and proximate result of the Individual Defendants' conduct, YRC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

450.    Plaintiff brings this action derivatively and for the benefit of YRC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of YRC, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

451.    YRC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

452.    Plaintiff is, and has continuously been at all relevant times, a shareholder of YRC. Plaintiff will adequately and fairly represent the interests of YRC in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

453.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

454.    A pre-suit demand on the Board of YRC is futile and, therefore, excused. At the time of filing of this action, the Board consisted of, and at the time of the filing of this amended complaint, the Board consists of the following nine Individual Defendants: Defendants Hawkins, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Nazemetz, and Winestock (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of these nine Directors.

455.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to cause the Company to engage in the Reweighing Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

456.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the Reweighing Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company more profitable to improperly boost the Company's bottom line and thus their own personal incomes and to appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a

substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

457.    Additional reasons that demand on Defendant Hawkins is futile follow. Defendant Hawkins has served as the Company's CEO since April 2018, as the Company's President and COO from January 2018 through April 2018, as YRC Freight's President from February 2014 through December 2017, and as YRC Freight's Senior Vice President of Sales and Marketing from January 2013 through February 2014. Thus, as the Company admits, he is a non-independent director. Moreover, from February 2014 through at least January 2018, Defendant Hawkins reported directly to Defendant Welch, who groomed Defendant Hawkins to succeed him as CEO. The Company provides Defendant Hawkins with his principal occupation, and he receives handsome compensation as described above, including $4,425,681 during the fiscal year ended December 31, 2018. Furthermore, Defendant Hawkins was responsible for several of the false and misleading statements and omissions that were made during the Relevant Period, including those made in the August 2018 and November 2018 8-Ks, and the May 2018, August 2018, and November 2018 10-Qs, which he personally made and/or signed off on. As the Company's highest officer and as a trusted director, Defendant Hawkins conducted little, if any oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme alleged herein, including to make false and misleading statements and omissions, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $839,229 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Hawkins is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Hawkins

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

458. Additional reasons that demand on Defendant Bromark is futile follow. Defendant Bromark has served as a Company director since July 2011 and serves as Chair of the Audit & Ethics Committee. He has received and continues to receive compensation for his role as a director as described above. As a long-time director and Chair of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Bromark served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Bromark served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Bromark signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. His insider sales before the fraud was exposed, which yielded at least $159,784 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Bromark breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

459. Additional reasons that demand on Defendant Carty is futile follow. Defendant Carty has served as a Company director since July 2011 and serves as a member of the Audit & Ethics Committee, the Compensation Committee, and the Finance Committee. He has received

and continues to receive compensation for his role as a director as described above. As a long-time director and member of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Carty served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Carty served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Carty signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. For these reasons, too, Defendant Carty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

460.    Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since July 2014. He has received and continues to receive compensation for his role as a director as described above. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Davidson served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover,

Defendant Davidson served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Davidson signed, and thus personally made the false and misleading statements in, the 2014–2017 10-Ks. His insider sales before the fraud was exposed, which yielded at least $102,351 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

461.    Additional reasons that demand on Defendant Doheny is futile follow. Defendant Doheny has served as a Company director since July 2011 and serves as Chair of the Finance Committee and as a member of the Compensation Committee. He has received and continues to receive compensation for his role as a director as described above. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Doheny served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Doheny served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Doheny signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. For these reasons, too, Defendant Doheny

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

462.    Additional reasons that demand on Defendant Friedman is futile follow. Defendant Friedman has served as a Company director since July 2011 and serves as a member of the Finance Committee and as a member of the Audit & Ethics Committee. He has received and continues to receive compensation for his role as a director as described above. As a long-time director and member of the Audit & Ethics Committee he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Friedman served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Friedman served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Friedman signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. For these reasons, too, Defendant Friedman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

463.    Additional reasons that demand on Defendant Hoffman is futile follow. Defendant Hoffman has served as a Company director since July 2011. He has received and continues to receive compensation for his role as a director as described above. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct

and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hoffman served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Hoffman served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Hoffman signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. For these reasons, too, Defendant Hoffman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

464.    Additional reasons that demand on Defendant Nazemetz is futile follow. Defendant Nazemetz has served as a Company director since March 2015 and serves as Chair of the Compensation Committee and as a member of the Governance Committee. She has received and continues to receive compensation for her role as a director as described above. As a trusted director she conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Nazemetz served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Nazemetz served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company,

and a fellow Board member. Furthermore, Defendant Nazemetz signed, and thus personally made the false and misleading statements in, the 2015–2017 10-Ks. For these reasons, too, Defendant Nazemetz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

465.    Additional reasons that demand on Defendant Winestock is futile follow. Defendant Winestock has served as a Company director since July 2011 and serves as Chair of the Governance Committee. He has received and continues to receive compensation for his role as a director as described above. As a long-time director he conducted little, if any, oversight of the Company's engagement in the Reweighing Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Winestock served on the Board during the DOJ Investigation, and periodically reviewed the major risks facing the Company, which certainly would have included the DOJ Investigation, as well as the Reweighing Misconduct. Moreover, Defendant Winestock served on the Board during the period that Defendant Welch, who had given deposition testimony or had been interviewed by the DOJ, was CEO of the Company, and a fellow Board member. Furthermore, Defendant Winestock signed, and thus personally made the false and misleading statements in, the 2013–2017 10-Ks. For these reasons, too, Defendant Winestock breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

466.    Additional reasons that demand on the Board is futile follow.

467.    As described above, three of the Directors directly engaged in insider trading, in violation of federal law. Directors Hawkins, Bromark, and Davidson collectively received

proceeds of over $1,101,364 as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

468. In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Reweighing Misconduct and the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

469. YRC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for YRC any part of the damages YRC suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

470. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

471.    The acts complained of herein constitute violations of fiduciary duties owed by YRC officers and directors, and these acts are incapable of ratification.

472.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of YRC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of YRC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

473.    If there is no directors' and officers' liability insurance, then the Directors will not cause YRC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

474.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

475.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

476.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

477.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

478.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

479.    Under the direction and watch of the Directors, the 2014-2018 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its operating revenue and operating income and understated its net losses as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

480.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements, while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein and the Company's revenues were artificially inflated as a result of the Reweighing Misconduct, and therefore any compensation based on the Company's financial performance was artificially inflated.

481.    The Proxy Statements also stated that the Code of Conduct "applies to all officers, directors, employees and contractors" of YRC. The Proxy Statements were false and misleading because, despite assertions to the contrary, YRC's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the engagement in the Reweighing Misconduct, and the insider trading engaged in by five of the Individual Defendants.

482.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, the approval of executive compensation, and with respect to the 2014 Proxy statement, approval of the Company's Amended and Restated 2011 Incentive and Equity Award Plan.

483.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock, which allowed them to continue breaching their fiduciary duties to YRC.

484.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

485.    Plaintiff on behalf of YRC has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

486.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

487.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of YRC's business and affairs.

488.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

489.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of YRC.

490.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Reweighing Misconduct.

491.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

492.   In breach of their fiduciary duties owed to YRC, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Reweighing Misconduct, which formed a major part of the Company's pricing strategy; (2) the Company had overstated its revenue as a result of the Reweighing Misconduct, in violation of GAAP; (3) the Reweighing Misconduct would subject the Company to enhanced scrutiny by the government and potential liability; (4) the Company was already being investigated by the DOJ in connection with the Reweighing Misconduct; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

493.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

494.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

495.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

496.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

497.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, YRC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

498.    Plaintiff on behalf of YRC has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

499.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

500.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, YRC.

501.     The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from YRC that was tied to the performance or artificially inflated valuation of YRC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

502.     Plaintiff, as a shareholder and a representative of YRC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

503.     Plaintiff on behalf of YRC has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

504.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

505.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

506.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

507.   Plaintiff on behalf of YRC has no adequate remedy at law.

## PRAYER FOR RELIEF

508.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of YRC, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to YRC;

(c)   Determining and awarding to YRC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing YRC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect YRC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of YRC to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding YRC restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 15, 2019                    Respectfully submitted,

**WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, P.C.**

*/s/ Karen W. Renwick*
KAREN W. RENWICK, Ks. Bar #12095
R. FREDERICK WALTERS, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, Missouri 64105
Telephone: (816) 421-6620
Facsimile: (816) 421-4747
Email: krenwick@wrrsvlaw.com
          fwalters@wrrsvlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (*pro hac vice*)
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of October, 2019, I electronically filed the above and foregoing document with the Clerk of the Court using the Court's ECF system, which will send notification of said filing to all counsel of record, if any.

*/s/ Karen W. Renwick* _____

## **VERIFICATION**

I, Dalton Hastey, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative amended complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under hte laws of the United States of America that the foregoing is true and correct. Executed this 15th day of October, 2019.

Dalton Hastey